# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **SA MUSIC LLC, ET. AL.** | \| | **Dkt No. 20-cv-2146-WHO** |
| | \| | **Dkt No. 20-cv-2794-WHO** |
| | \| | **Dkt No. 20-cv-2965-WHO** |
| **Plaintiffs,** | \| | |
| | \| | |
| **v.** | \| | |
| | \| | |
| **APPLE, INC. ET. AL.** | \| | |
| | \| | |
| **Defendants.** | \| | |

_____

_____


# EXPERT WITNESS REPORT OF

# BOB KOHN


**September 3, 2021**

_____

## TABLE OF CONTENTS

I.   Expert's Background ................................................................................................ 4

II.  Expert Assignment .................................................................................................. 8

III. The Facts Considered, The Opinions Expressed Herein, and the Basis and Reasons
for them ...................................................................................................................... 9

   A.   Summary of the Ways in Which Musical Recordings are Digitally Delivered ...... 9

     1. Permanent Download ...................................................................................... 10

     2. Interactive Streaming ...................................................................................... 11

     3. Limited Download ........................................................................................... 11

     4. Non-Interactive Streaming .............................................................................. 11

   B.   Apple's iTunes Music Store .................................................................................. 12

   C.   Music Licenses Required by Apple to Operate Its Digital Music Service ........... 13

     1. Licenses Required to Make and Distribute Digital Phonorecord Deliveries ...... 15

      (a)  Negotiated Mechanical License from Music Publishers .............................. 15

      (b)  Compulsory Mechanical License under Section 115 ................................... 15

      (c)  Harry Fox Agency  ...................................................................................... 16

      (d)  Pass-through Mechanical Licenses from Providers of Sound Recordings ... 17

      (e)  Mechanical Licenses for Musical Compositions Embodied on Pirated
      Recordings Can Only Be Obtained by Negotiating a Voluntary License Directly
      with the Copyright Owner of the Musical Composition ..................................... 17

     2. Licenses Required to Make Server Copies ........................................................ 18

     3.  Licenses Required to Render Public Performances ........................................... 20

     4.  Importation Authorization ................................................................................ 21

   D. Notices of Intention Produced by Apple Did Not Comply with Music Industry
Custom and Practice or Regulatory Requirements .......................................................... 21

     1. Recordings Not Lawfully Fixed and Making of DPD's Not Authorized by the
Copyright Owners of the Musical Works Embodied in the Recordings ......................... 22

     2. NOI's Did Not State the Property Catalog Numbers and Label Names .............. 22

     3. NOI's Were Served After the Making and Distributing of the Phonorecords ...... 24

   E. Limited Quantity Licenses for Permanent Digital Downloads Did Not Effect
Mechanical Licenses for Permanent Digital Downloads Delivered Prior to the License
Date………………………………………………………………………………………25

F. No Evidence of Import Authorization .................................................................. 26

G. Existing Negotiated Mechanical Licenses, including Pass-Through Licenses, Could Not Be Reasonably Relied Upon ..................................................................................... 26

1. Pass-Through Licenses Not Likely to be Effective for Permanent Downloads……………………………………………………………………26

(a) Most Existing Mechanical Licenses Issued by Harry Fox Agency Were Ineffective for Digital Phonorecord Deliveries ............................................................. 27

(b) Mechanical Licenses Issued by "Controlled-Composition" Clauses in Recording Artist Contracts Were, In Practice, Unverifiable and Unreliable .................. 28

2. Pass-Through Licenses Not Effective for Interactive Streaming ......................... 30

3. Pass-Through Licenses Not Effective for Recordings Unlawfully Fixed ............ 31

H. Effective Means of Avoiding Copyright Infringement........................................... 31

1. Using In-house Staff to Ensure Effective License Procurement ........................... 31

2. Putting "On-Hold" and Not Releasing Unlicensed Recordings ........................... 33

3. Due Diligence Review of Distributors' Applications............................................ 34

I. Apple Continued to Reproduce and Digitally Distribute Plaintiff's Copyrighted Works Even AFTER it received Multiple Notices from the Owners of Sound Recordings to Cease and Desist the Unauthorized Reproduction and Distribution of Such Recordings 36

J. Apple's Conduct Is Willful ..................................................................................... 37

IV. PUBLICATIONS AUTHORED WITHIN THE PRECEDING 10 YEARS…. 39

V. DATA OR OTHER INFORMATION CONSIDERED IN FORMING THESE OPINIONS   ............................................................................................................. 40

VI. EXPERT WITNESS FEE ........................................................................................ 40

VII. INTENDED TRIAL EXHIBITS AND SUPPLEMENTATION…………………...40

## I. EXPERT'S BACKGROUND

I was the co-founder and Chairman of the download music service provider called EMusic.com, which began selling downloadable files of sound recordings of copyrighted musical works for 99 cents per track in July 1998, nearly five years before Apple's initial launch of its iTunes online music store. The iTunes music service began selling downloadable music files for 99 cents per track in October 2003.

I am also the author *Kohn On Music Licensing,* Fifth Edition (Wolters Kluwer, 2019), an 1,800-page treatise first published in 1992, when co-authored with my late father Al Kohn, who was serving at the time as vice president of copyright and licensing for Warner/Chappell Music. The book addresses various types of music publishing and recording agreements both domestically and internationally, including music industry customs and practices concerning the licensing of musical works in sound recordings for distribution and delivery in physical and digital formats.

*Kohn On Music Licensing* was cited by the U.S. Supreme Court in *Eldred v. Ashcroft*, 537 U.S. 186, fn. 21 (2003) for entertainment-industry business practices concerning the assignment of copyrights. It also was quoted at length in in *Bridgeport Music v. Dimension Films*, 410 F.3d 792, fn. 18 (6th Cir. 2005), concerning industry customs and practices in the use of digital samples of existing sound recordings in new sound recordings. In *Woods v. Bourne Co.*, 60 F.3d 978 (2d Cir. 1995) and *Boosey & Hawkes Music Publishers, Ltd. v. Buena Vista Home Video*, 145 F.3rd 481 (2d Cir. 1988), the treatise was cited for industry practices concerning performance rights administered by ASCAP. In *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.* 958 F.Supp. 170 (1997), aff'd 155 F.3d 17 (2d Cir. 1998), the book was cited with approval regarding the

interpretation of the scope of mechanical licenses issued by the Harry Fox Agency ("HFA").

I am an attorney licensed to practice in California and before the Second Circuit Court of Appeals. My expertise includes business customs and practices within the music publishing, recording and entertainment industries, particularly with respect to the acquisition and licensing of rights in musical compositions and sound recordings, and the customs and practices observed in connection with such transactions. I have an LL.M degree from Columbia Law School, earning highest honors (James Kent Scholar), where I also was a Visiting Scholar, conducting independent academic research.

Upon graduating from Loyola Law School, Los Angeles in 1981, I became an associate attorney for the Law Offices of Milton A. "Mickey" Rudin, who represented, among others, Frank Sinatra, Liza Minelli, Cher, Steely Dan, Irvin Azoff, Warner Bros. Music, Warner Bros. Publications, 20th Century Fox Studios, and other entertainment industry clients. During that time, and for several years thereafter, I served as an Associate Editor of the Entertainment Law Reporter.

From 1983 through 1997, I served as chief in-house legal counsel for several high tech firms, including Ashton-Tate (NASDAQ:TATE), a developer and publisher of personal computer software (*e.g.*, dBASE II), Borland International, Inc. (NASDAQ:BORL), a developer and publisher of personal computer software (*e.g.*, Turbo Pascal, Sidekick, Turbo C++, Paradox, Quattro Pro, etc.), and Pretty Good Privacy, Inc., a developer of encryption software (*i.e.*, PGP).

In 1998, I founded and became Chairman of EMusic.com, Inc. (NASDAQ: EMUS), a pioneering digital music download company which, in July, 1998, began selling

digital phonorecord deliveries of files containing sound recordings of musical works. Serving as chief legal counsel for EMusic, I drafted and negotiated all of the early license agreements by which we eventually licensed nearly a million sound recordings and the musical works embodied in them from hundreds of independent record labels, and hundreds of major and independent music publishers, both directly and through the Harry Fox Agency. During that time, I made numerous presentations to representatives of the U.S. government, including as the Federal Trade Commission, the Department of Justice, and members of the U.S. Senate and House of Representatives, regarding emerging digital technologies affecting the digital transmission and delivery of sound recordings and musical works. I also testified before the European Union on the subject of music licensing for the Internet, copyright protection, and cross-border transactions in digitally transmitted music. EMusic was acquired by Universal Music Group in 2001.

In 2005, I founded RoyaltyShare, Inc., a provider of revenue and royalty processing services that assists record companies with discharging their royalty obligations to recording artists, record producers, and music publishers. RoyaltyShare was acquired in 2012 by what is now a subsidiary of Sony Music Entertainment, one of the three major record labels.

In 2007, I testified before late Judge William C. Conner, Sr. on behalf of ASCAP to inform the court on how musical works and sound recordings are used on the Internet, including their use on services such as AOL, RealNetworks, and Yahoo! *See*, *United States v. ASCAP in the Matter of America Online, Inc., RealNetworks, Inc., and Yahoo!, Inc.*, 559 F.Supp.2d 332 (2008).

In 2015, on behalf of the recording artist known as Jay-Z, I provided expert witness testimony on the language and purpose of several music license agreements in light of music industry practices. *Fahmy v. Jay-Z (aka, Shawn Carter), et. al.*, Case No. 2:07-cv-05715-CAS (April 28, 2015).

In 2017, on behalf of recording artist Katy Perry, I provided a federal court with an expert report on industry customs and practices concerning the scope of live concert public performances licenses granted by performances rights societies. *Marcus Gray v. Katy Perry,* Case No. 2:15-cv-05642-CAS-JC (April 3, 2017).

In 2018, I testified as an expert on the interpretation of the terms of an exclusive recording agreement between Universal Music Group and the recording artist known as "50 Cent," as well as industry practices concerning the use of the name, voice and likeness of a recording artist in connection with the marketing and distribution of sound recordings of other recording artists. *Curtis James Jackson, III (p/k/a/ 50 CENT) v. William Leonard Roberts, II (p/k/a/ RICK ROSS),* Case No. 3:17-cv-00550-WWE. (D. Conn.).

In 2019, I testified on behalf of music publisher BMG Rights Management as an expert on music industry customs and practices with respect to the use of music on commercial airline flights. BMG *Rights Management (US) LLC v. Global Eagle Entertainment,* Case No. 2:18-cv03723 (C.D. Cal.)

In 2019, I testified on behalf of several music publishers, including the publisher of the music recorded by "The Four Seasons," as an expert on music industry customs and practices regarding the licensing of musical works for interactive subscription and non-subscription services of digital music service providers. *Bob Gaudio, et. al. v. Apple USA, Inc.*, Case No. 3:17-cv-01052 (M.D. Tenn.).

I am the co-inventor of the patent for a means of tracking revenues and producing royalty statements arising from the exploitation of musical works and sound recordings. *Web-based Royalty System and User Interface*, Patent No. US 8,712825 (April 29, 2014).

## II.  EXPERT ASSIGNMENT

My assignment in this report was to help supplement the record with music industry customs and practices concerning the licensing of musical works for the reproduction and digital transmission by online music service providers. Specifically, I've been asked to opine on at least the following:

- The ways in which musical works may be distributed by means of digital audio transmissions, including digital phonorecord deliveries, and important music industry terms of art customarily used in connection with such transmissions;
- The kinds of music licenses required by Apple to operate its digital music services, including mechanical reproduction licenses;
- Music industry customs and practices in procuring mechanical reproduction licenses required to operate such services, including related terms of art;
- Whether the policies and practices followed by Apple to procure the required reproduction licenses conformed to industry practices; and
- Apple's policies relating to the prevention of copyright infringement.

In preparing this report, I have relied on music industry standards concerning the licensing of musical works for interactive streaming, permanent download, and public performance, as well as my education, training, and personal experience in operating a digital music service provider which licensed over a million sound recordings and musical works for digital delivery to consumers. Though my opinions in this report, and the basis and reasons for them, necessarily include reference to the facts of the case, statutes, and

conclusions of law set forth in court decisions, I do not intend to render any of conclusions

of law in the present action over which the Court must decide.[1]

### III.  THE FACTS CONSIDERED, THE OPINIONS EXPRESSED HEREIN, AND THE BASIS AND REASONS FOR THEM

**A.      Summary of the Ways in Which Musical Recordings are Digitally Delivered**

*Sound recordings*[2] containing *musical works*[3] may be delivered or transmitted to

consumers in several basic ways: (1) by means of *physical* phonorecords (*e.g.*, vinyl

albums, single records, cassette tapes, or CDs) for distribution to the public for private

---

[1] *See, Gray v. Katy Perry et. al.,* Case No. 2:15-cv-05642-CAS-JC at fn 7 (April 3, 2017).

[2] A *sound recording* is a work that results "from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. §101. Thus, a *sound recording* is an audio-only work and one that is that is separate from any musical or literary work that may be embodied in it. A sound recording may be distributed by means of *phonorecords* (defined below), digitally transmitted by means of *digital phonorecord deliveries* (defined below) and other forms of digital audio transmissions, or otherwise transmitted, as by terrestrial analog broadcast.

[3] The term *musical work* is not defined by the Copyright Act but is generally understood to mean a song (i.e., a short poem or set of words set to music) or an instrumental composition containing one or more organizational elements, such as melody, chord progression, and rhythm or beat. In the music industry, the terms musical work, musical composition, and song are often used synonymously. A sound recording embodying a musical work is considered a derivative work of such musical work. Musical works may be reproduced in copies or phonorecords.

use; (2) by *permanent download,*[4] (3) *by interactive stream*[5] and *limited download,*[6] (4) by *non-interactive stream,*[7] and (5) *by terrestrial "radio" broadcast service.*

The several means of delivery or transmission of musical works by digital phonorecord delivery include: (1) permanent download, (2) interactive streaming, (3) limited download, (4) and noninteractive streaming.

### 1.    *Permanent Download*

A *permanent download* of a musical recording is a form of digital phonorecord delivery where a digital file containing the recording is delivered to a user's device (e.g., computer, music player, phone, or other device) in a way that the user may retain a copy

---

[4] The term *permanent download* means "a digital phonorecord delivery that is distributed in the form of a download that may be retained and played on a permanent basis." 37 F.R. 385 Subpart B, §385.11 (effective March 1, 2009). The definition of *permanent download*, as revised under the 2018 Act, now reads: "a digital transmission of a sound recording of a musical work in the form of a download, where such sound recording is accessible for listening without restriction as to the amount of time or number of times it may be accessed. A permanent download is a digital phonorecord delivery." 17 U.S.C. §115(e)(24) (post-2018 Act).

[5] The term *interactive stream* means "a digital transmission of a sound recording of a musical work in the form of a stream, where the performance of the sound recording by means of such transmission is not exempt under section 114(d)(1) and does not in itself, or as a result of a program in which it is included, qualify for statutory licensing under section 114(d)(2). An interactive stream is an incidental digital phonorecord delivery under 17 U.S.C. §115(c)(3)(C) and (D)." 37 F.R. 385 Subpart B, §385.11 (published on January 26 and effective March 1, 2009). The Music Modernization Act of 2018 (the "2018 Act") revised the definition of *interactive stream* to read as follows: "a digital transmission of a sound recording of a musical work in the form of a stream, where the performance of the sound recording by means of such transmission is not exempt under section 114(d)(1) and does not in itself, or as a result of a program in which it is included, qualify for statutory licensing under section 114(d)(2). An interactive stream is a digital phonorecord delivery." 17 U.S.C. §115 (e)(13) (post-2018 Act).

[6] The term *limited download* means "a digital transmission of a sound recording of a musical work to an end user, other than a stream, that results in a specifically identifiable reproduction of that sound recordings that is only accessible for listening for—(1) [a limited amount of time]; or (2) [a specified number of times]. A limited download is a general digital phonorecord delivery under 17 U.S.C 115(c)(3)(C) and (D)." 37 F.R. 385 Subpart B, §385.11 (published on January 26 and effective March 1, 2009). The 2018 Act revised the definition of *limited download* to read as follows: "a digital transmission of a sound recording of a musical work in the form of a download, where such sound recording is accessible for listening only for a limited amount of time or specified number of times. A limited download is a digital phonorecord delivery. 17 U.S.C. §115(e)(16) (post-2018 Act).

[7] The term *non-interactive stream,* or "webcast," means a digital transmission of a sound recording of a musical work in the form of a stream, where the performance of the sound recording by means of such transmission is not exempt under Section 114(d)(1) and does not in itself, or as a result of a program in which it is included, qualify for statutory licensing under Section 114(d)(2).

(*i.e.*, phonorecord) of the recording on a permanent basis and play it repeatedly, as the user would a CD of the recording.

### 2.      *Interactive Streaming*

By contrast, when one *streams* a recording, a digital file of the recording is not permanently transferred to the user; rather, the data making up the recording is transmitted digitally and rendered or played on the user's device on a real-time basis (*i.e.*, during the time that it is being transmitted) and the user does not retain a permanent copy for unlimited repeated play.

Recordings may be digitally streamed in two basic ways: *interactive* and *non-interactive.* The user of an *interactive* streaming service has full control over which recording the user will listen to, including when to listen to it and in what order, and the user can further use the system to develop and store "playlists' that facilitate the control over the selection of the recordings and timing of their transmission.

### 3.      *Limited Download*

Many interactive streaming services permit a limited download of the recording, which, like a permanent download, is a digital data file of the recording transmitted to a user's device. However, the file is delivered in a form that is only accessible by the user for listening over a limited period of time or a specified number of times. This would allow the user to listen to the recording when listening in real-time is not possible or convenient, such as when the listener is riding in a subway or is flying on a commercial aircraft.

### 4.      *Non-Interactive Streaming*

Recordings by non-interactive stream are transmitted in a manner similar to the way recordings are broadcast on terrestrial radio, where the listener has no or little influence in

advance over what recordings will be played or in what order. An example of a non-interactive stream service is XMSirius satellite radio. Of course, the listener of a terrestrial broadcast radio program can control the genre of the recording by tuning into one or another radio station that specializes in a particular music genre, such as classic rock, country music, R&B, and the like. Or the radio listener can call in to the radio station to make a request. But otherwise, the radio listener, has little or no ability to choose the ordering of the recordings and the timing of the transmissions. Similarly, the listener of a *non-interactive* digital streaming service may not choose what recordings to listen to or in what order.

Some non-interactive streaming services (such as Pandora) permit the listener some limited influence over what recordings will be streamed by allowing the user to select a genre, by music genre or artist's name, or by allowing the user to provide feedback to the service on particular recordings the listener may like or dislike.

## B.     Apple's iTunes Music Store

Apple, Inc. (hereinafter, "Apple") has operated an interactive digital music service in the United States known as the "iTunes music store" that offers digital audio transmissions of *sound recordings* of *musical works* to members of the public in the forms of (a) *permanent downloads* and (b) *interactive streams* in the form of promotional clips. Apple does not, to my knowledge, engage in *analog, terrestrial "radio" broadcast services* or in the duplication of *physical* phonorecords (*e.g.*, vinyl albums, cassette tapes, or CDs) for physical distribution to the public for private use. It is my understanding that Apple launched the iTunes music store on October 16, 2003.

To operate iTunes, Apple receives, typically from record companies and other owners of sound recordings, digital data files containing (a) sound recordings (*i.e.*, sometimes called *source files*, which the service uses to create and store *server copies*[8] from which digital audio transmissions of those recordings originate) and (b) *metadata*[9] (i.e., information identifying or otherwise pertaining to the sound recordings and any musical works embodied therein).

## C.     Music Licenses Required by Apple to Operate Its Digital Music Service

A provider of a digital music service must obtain licenses from those who control the copyrights in the *sound recordings* to be offered by the service and any *musical works* embodied in those recordings. The discussion below will be limited to the licenses that must be obtained from the owners of *musical works*; the licenses required for the use of *sound recordings* are summarized elsewhere.[10] The discussion below will also not address

---

[8] A *server copy* (or more appropriately, *server phonorecord*) of a sound recording embodying a musical work is a phonorecord that is made, not for distribution for private use, but for some other purpose, such as to facilitate a performance, broadcast, or digital transmission, such as an interactive stream, limited download, or permanent download. See, generally, *Kohn On Music Licensing*, 4th Ed., Chapter 14 on "Licensing Music in Background Music Services, Digital Jukeboxes, and Other Commercial Reproductions (Electrical Transcription Licenses" at 1065, 1073-1074). In the music industry, the terms server copy, ephemeral recording, source file, recording "master" or "stamper," are various terms used to describe a phonorecord used to facilitate either the duplication and distribution or digital delivery of phonorecords to the public for private use or to facilitate the performance, broadcast, or digital transmission of the sound recording. The kinds of phonorecords in which server copies are embodied are typically computer hard disks or other form of permanent computer memory that operate as "servers," or devices that facilitate the serving or transmission of data, such as data that comprises the digital representation of a sound recording.

[9] Metadata may include the title of the recording, the names of recording artists or performers, the genre of the music, the title of the album or compilation (if any) to which the recording may have been associated and its track number on the album, the duration of the recording, the name of the owner of the recording, any unique identifiers associated with such works (*e.g.*, ISRC, UPC codes, etc.), and other information that is used to display information to the user. Apple would have provided metadata specifications to record companies and other the suppliers of sound recordings by means of a template showing how the supplier should deliver the source recording files and metadata to Apple.

[10] *See*, *Kohn On Music Licensing*, 5th Edition, Chapter 24 on the "Licensing of Sound Recordings" (Wolters Kluwer, 2019).

-13-

the licenses required by either *non-interactive digital music services* (i.e., webcasting)[11] or

*terrestrial analog broadcast services* (i.e., broadcasts over AM or FM radio)[12]

   As noted, Apple has operated a digital music service that provides *permanent downloads* and *interactive streams* (in the form of promotional clips). To engage in providing its *permanent download* and/or *interactive streaming* services Apple must obtain licenses that would permit the distribution of digital phonorecord deliveries of the musical works embodied in sound recordings associated with such deliveries and the reproduction of such musical works in *server copies*.

   The licenses required would be in the form of *mechanical reproduction licenses (or mechanical licenses)*.[13] A *mechanical license* permits another to prepare a sound recording

---

[11] Non-interactive music service providers who, for example, offer transmissions of musical works which are exempt under Section 114(d)(1) and (b) those which qualify for statutory licensing under Section 114(d)(2) also require public performance licenses from the owners of such works, typically through their respective performance rights organizations, such as ASCAP and BMI. These non-interactive music service providers also have a limited statutory server copy license to make ephemeral recordings, or server copies, for the purpose of facilitating their transmissions. 17 U.S.C. §112(e). Beyond this statutory server copy license, music services that offer non-interactive streams do not require reproduction licenses (e.g., they do not require mechanical licenses). The discussion below will exclude licensing requirements for these non-interactive music service providers.

[12] Terrestrial analog radio providers who broadcast copyrighted sound recordings and musical works to the public require public performance licenses from the copyright owners of the musical works, typically obtained through a PRO. These radio broadcasters also have a limited statutory license to make ephemeral recordings solely for the purpose of facilitating their broadcast transmissions. 17 U.S.C. §112(a). Beyond this limited statutory reproduction license, terrestrial broadcast providers that offer such non-interactive digital streams do not require other forms of reproduction licenses (*e.g.*, they do not require mechanical licenses, etc.).

[13] Under nomenclature used prior to the Music Modernization Act, digital phonorecord deliveries (or DPDs) may be incidental or general. *Incidental* DPDs include interactive streams. *General* DPDs include permanent downloads and limited downloads. The 2018 Act clarified that all permanent downloads, limited downloads, and interactive streams constitute digital phonorecord deliveries). 17 U.S.C. §115(e)(10) (post-2018 Act). A mechanical license may be distinguished from other forms of licenses that permit the reproduction of musical works, such as: (i) *print license*, which permits the reproduction of musical works in sheet music, books and folios; (ii) *synchronization license*, which permits the reproduction of musical works in audiovisual works; and (iii) *electrical transcription license*, which permits the reproduction of a musical work, not for distribution or delivery to the public for private use, but to facilitate another commercial use, such as a analog broadcast or digital audio transmission. A mechanical license obtained under the compulsory license provision of Section 115 of the Copyright Act, or obtained from a music copyright owner pursuant to a

that embodies the musical work, to reproduce the musical work in phonorecords, and to distribute such phonorecords, or to make digital phonorecord deliveries thereof, to the public for private use.

  *1. Licenses Required to Make and Distribute Digital Phonorecord Deliveries*

  In the normal course, mechanical reproduction licenses may be procured in four ways: (a) by means of a negotiated mechanical license directly from the copyright owner; (b) by means of a *compulsory* mechanical license by service of a written notice under Section 115 of the Copyright Act, (c) by means of a Section 115 license from the Harry Fox Agency, or (d) by means of a mechanical license obtained by the owner of the sound recording which is "passed-through" to the music service provider.

  **(a) Negotiated Mechanical License from Music Publishers**

  A prospective licensee always had the ability to negotiate the terms of a mechanical license with the copyright owner, including the royalty rate paid for each sale, term of the license, and the uses covered by the license.

  **(b) Compulsory Mechanical License under Section 115**

  The ability to license *by statutory compulsory means* the reproduction of musical works in the form of permanent digital phonorecord deliveries has been available since at least as early as the 1995 Act.

  Under Section 115 of the Copyright Act (prior to the 2018 Act), a provider of digital music services could obtain a license to reproduce and distribute phonorecords of a musical

---

voluntary mechanical license agreement, will include permission, expressly or impliedly, to do or authorize any of the following (subject to a variety of conditions): (a) make (i.e., prepare) a musical arrangement of the work, (b) make a sound recording of the work, (c) to duplicate phonorecords of the work for distribution or digital deliveries to the to the public for private use, and (d) reproduce master "stamper" or "server" copies of the work (*i.e.*, phonorecords to facilitate such duplication, distribution or delivery).

work by digital phonograph deliveries by serving a Notice of Intention to Obtain a Compulsory License for the Making and Distributing of Phonorecords ("Notice of Intention" or "NOI"). The Copyright Office promulgated regulations governing the requirements for the content and service of NOI's.[14]

Among the requirements is that the NOI state the "catalog number or numbers, and label name or names, used or expected to be used on phonorecords already made (if any) or expected to be made under the compulsory license." The latter requirement means that an NOI will only authorize a license to use a musical work as embodied in a specific edition of a phonorecord identified by its catalog number and its "label name"—that is, the name of record company who produced the phonorecord and authorized its reproduction and distribution. The compulsory license that would allow one digital service provider or record company to do so would not authorize another digital service provider or record company to produce phonorecords of the same sound recording embodying the musical work.

Moreover, Section 115 makes it clear that a compulsory license can only be effective with respect to musical works embodied in sound recordings that were lawfully fixed and the making of digital phonorecord deliveries of such recordings were authorized by the owner of the copyright in the musical work pursuant to a valid compulsory license.[15]

The NOI must also state the "expected date of initial distribution" made or expected to be made of the phonorecords so authorized. The NOI must be served before, or within

---

[14] https://www.copyright.gov/title37/201/37cfr201-18.html; *Kohn On Music Licensing*, 5th Edition at 885-889.

[15] 17 U.S.C. 115(a)(1) ("A person may not obtain a compulsory license for use of the work in the making of phonorecords duplicating a sound recording fixed by another, **including by means of a digital phonorecord delivery**, unless: (i)  such sound recording was fixed lawfully; and (ii) the making of the phonorecords was authorized by the owner of copyright in the sound recording or, if the sound recording was fixed before February 15, 1972, by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording.") The 1995 Act adds the bolded language.

30 days after, the making, but *before distributing* any phonorecords of the work. Failure to

serve or file the NOI on a timely basis (1) forecloses the possibility of a compulsory license

and, in the absence of a negotiated license, renders the making and distribution of

phonorecords actionable as acts of infringement under section 501 and full subject to the

remedies provided by sections 502 through 506 and 509. [16]

      **(c)**    **Harry Fox Agency**

     The Harry Fox Agency ("HFA") is the mechanical licensing agent for thousands of

music publishers.  HFA offers prospective licensees mechanical licenses that adopt the

terms of Section 115 but without the need to serve the Notice of Intention (discussed in (b)

above).

      **(d)**    **Pass-through Mechanical Licenses from Providers of Sound Recordings**

     A mechanical license obtained by a record label or distributor that provides a sound

recording to a digital music service may "pass through" such license to the digital music

service.[17]

      **(e)**    **Mechanical Licenses for Musical Compositions Embodied on Pirated Recordings Can Only Be Obtained by Negotiating a Voluntary License Directly with the Copyright Owner of the Musical Composition**

     Of the four ways discussed above for generally obtaining a mechanical license, only

a negotiated license directly with the copyright owner of the musical composition is

---

[16] 17 U.S.C. 115(b)(2).  The MMA changed "The NOI must be served before, or within 30 days after, the making, but *before distributing* any phonorecords of the work" to "not later than 30 calendar days after, first making any such digital phonorecord delivery"

[17] A "pass-through" mechanical license is an individual voluntary mechanical license or compulsory mechanical license obtained by the owner of a sound recording to make and distribute, or authorize the making and distribution, of permanent downloads embodying a specific musical work on a specific recording.

possible when the sound recording is pirated. This is because Section 115 prohibits the availability of a compulsory license when the sound recording is not lawfully fixed or duplicated with permission of the copyright owner of the sound recording. Harry Fox Agency licenses expressly adopt the provision of Section 115. And pass-through licenses are not possible for pirated recordings. Of course, the copyright owner of the musical composition embodied on a pirated recording is under no obligation to license their work and is entitled to reject any license request on any financial terms. It is my understanding that neither Apple nor any of its content providers obtained a negotiated license from any of the Plaintiffs for any of the recordings at issue in any of these cases.

### 2.      *Licenses Required to Make Server Copies*

To offer *permanent downloads* or *interactive streams* of a copyrighted musical work, Apple must obtain a *server copy license*[18] (under the authority of the music copyright owner's exclusive right to reproduce the work in phonorecords), because Apple reproduces the musical work on its computer servers for the commercial purpose of facilitating digital audio transmissions. While *server copy licenses* and *mechanical licenses* authorize entirely distinct forms of reproduction, a licensee of a valid mechanical license will, either expressly or customarily, receive with the mechanical license the privilege of making *server copies* to facilitate the purpose of the mechanical license.

---

[18] The term *server copy license*, a form of electrical transcription license, permits another, under the authority of a copyright owner of a musical work, to reproduce a sound recording embodying the musical work in a phonorecord that is not for distribution or digital delivery to the public for private use, but is for some other commercial purpose, such as to facilitate a performance, broadcast, digital delivery, or other kind of transmission. See, *Kohn On Music Licensing*, Chapter 14 on "Electrical Transcription Licenses" at 1073-74 (Wolters Kluwer, 2010).

The requirement of a license to make server copies of musical works to facilitate an *interactive streaming* service was once questioned,[19] but that question was answered decisively many years before Apple launched its interactive streaming service.[20] In *Rodgers & Hammerstein Org. v. UMG Recordings, Inc.*, 60 U.S.P.Q.2d (BNA) 1354, No. 00-Civ-9322 (JSM) (S.D.N.Y., 2001), the court held that server copies of sound recordings of musical works reproduced without authorization for purposes of facilitating interactive streams constituted an infringement of the copyrights in the *musical works* embodied in those recordings.

In that case, UMG contended that that existing mechanical licenses that it obtained from music publishers and the Harry Fox Agency permitted the reproduction and distribution of phonorecords, including any server copies it made, but District Judge John S. Martin, Jr. ruled that any mechanical license that permitted the reproduction and distribution of musical works in phonorecords in physical formats (e.g., CDs, vinyl records) only authorized the making of "master" or "stamper" reproductions used for duplicating the work in the specific physical formats licensed by the mechanical license. It did not authorize the making of server copies for interactive streams. Thus, the server copies of sound recordings which UMG reproduced to facilitate their interactive streams were made without authorization and therefore constituted an infringement of the copyrights in the musical works embodied in those recordings.

---

[19] Carolyn Horwitz, "A Number of Music Publishers Have Filed Suit Against Universal Music Group (UMG) and the Website Jimmy and Doug's FarmClub.com," *Billboard* (December 16, 2000) (suit by Rodgers & Hammerstein Org. and other music publishers claimed that UMG had, without plaintiffs' permission, copied hundreds of tracks embodying plaintiff's copyrighted musical works onto its servers to facilitate an interactive stream service).

[20] *Rodgers & Hammerstein Org. v. UMG Recordings, Inc.*, 60 U.S.P.Q.2d (BNA) 1354 (S.D.N.Y., Sept. 26, 2001) (server copies of sound recordings made without authorization for purposes of facilitating interactive streaming held to be an infringement of the copyrights in the musical works in such recordings).

That result appeared consistent with a decision reached several months earlier by District Judge Jed S. Rakoff, who held that the unauthorized reproduction by MP3.com of hundreds of thousands of server copies of sound recordings, embodying as many copyrighted musical works, for the purpose of facilitating interactive streams without authorization of the owners of the sound recording copyrights, constituted an infringement of those copyrights, and were not a fair use thereof. *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000).

### 3. *Licenses Required to Render Public Performances*

To operate its *interactive streaming* service, Apple would require, in addition to mechanical licenses to reproduce musical works, licenses to engage in the public performance of such musical works. These would typically be in the form of public performance licenses obtained from the applicable public performance rights organization (i.e., "PRO," such as ASCAP, BMI, and SESAC).

Such licenses, however, expressly will *not include* a license to reproduce copies or phonorecords of the musical work *for any purpose.*[21] In other words, if an additional reproduction license was necessary for the intended use, that license would not be included in the public performance license. Thus, Apple would *not* as a matter of practice receive from any of the PROs any form of reproduction license, such as a separately required license to make *server copies* or deliver to users *mechanical reproductions,* or any other kind of reproductions.

---

[21] *See*, for example, the standard *ASCAP Audio Streaming License,* which permits the public performance of musical works in interactive streaming services: "*No Right to Reproduce, Copy or Distribute*. Nothing in this License Agreement shall be construed to grant to Licensee, or any third party, any right to reproduce, copy or distribute by any means, method or process whatsoever, any Musical Works (or any part thereof) that are included in the ASCAP Repertory licensed under this License Agreement." *Kohn On Music Licensing*, Chapter 18, on "Licensing Music in Live and Recorded Public Performances (Public Performance Licenses)," Appendix Form 18-36.

#### 4.      *Importation Authorization*

In addition to mechanical licenses, when a party seeks to import a musical recording embodying a musical composition, Section 602 of the Copyright Act requires the authorization of the copyright owner, even if the recordings were manufactured lawfully outside of the U.S. *T.B. Harms Co. v. Jem Records, Inc.,* 655 F.Supp. 1575 (D.N.J. 1987)("the mere act of importation constitutes an act of infringement") (citing House Report at 170, U.S. Code Cong. & Admin. News 1976, p. 5786.); See also 17 U.S.C. § 501(a) ("Anyone ... who imports copies or phonorecords into the United States in violation of § 602, is an infringer of the copyright").

### D.      Notices of Intention Produced by Apple Did Not Comply with Music Industry Custom and Practice or Regulatory Requirements

I have reviewed some of the NOIs produced by Apple in these lawsuits by which Apple claims to have been authorized to distribute recordings of Plaintiffs' compositions. The NOIs produced by Apple would not comply with music industry custom and practice and would not effectuate valid compulsory licenses to the extent (1) the sound recordings to which such NOI's referred were not lawfully fixed in the phonorecords provided to Apple, (2) the making of digital phonorecord deliveries of such recordings were not authorized by the owner of the copyright in in such recordings, (3) the NOI's did not identify specific releases or state the proper catalog number or numbers, and label name or names, used on the phonorecords, and (4) in many cases, the NOIs were served after the making and distributing of phonorecords of the subject musical works, any of which would render the purported NOI's invalid and therefore not effectuating a valid compulsory license.

1.      *Recordings Not Lawfully Fixed and Making of DPD's Not Authorized by the Copyright Owners of the Musical Works Embodied in the Recordings*

As noted, a compulsory license under Section 115 of the Copyright Act for the use of a musical work in a sound recording fixed by another is only available when the sound recording was lawfully fixed and the making of digital phonorecord deliveries of such recordings were authorized by the owner of the copyright in the sound recording.[22] Simply stated, pirated recordings are not eligible for Section 115 licenses.

It is my understanding that none of the sound recordings in the phonorecords delivered to Apple by Adasam, Pickwick, Genepool, and Ideal Music, for digital distribution on iTunes were lawfully fixed or duplicated. None of these providers (or the labels they distributed) was the original releasing label for any of the recordings at issue. Apple has not produced any evidence that the owners of the copyrights in the relevant recordings authorized Adasam, Pickwick, Genepool, and Ideal Music to distribute them to Apple. To the contrary, the major record labels that own many of the original releases at issue have submitted declarations expressly stating that they never gave such authorization. See Declarations from representatives of Sony, Universal, Warner, Concord, and BMG. Under these circumstances, none of the entities in these supply chains were eligible for a mechanical license under Section 115 and the MRI notices are void.

2.      *NOI's Did Not State the Property Catalog Numbers and Label Names*

Notices of Intention must comply with, in form, content, and manner of service with the requirements that the Register of Copyrights shall prescribe by regulation. 17 U.S.C. §115(b)(1) (pre-2018 Act). The Copyright Office regulations set forth the specific

---

[22] 17 U.S.C. 115(a)(1)(i) & (ii) (pre-2018 Act).

requirements for a Notice of Intention to effectuate a compulsory license. 37 CFR §201.18. One important requirement is that the NOI must include "the name of the principal recording artist . . . the catalog number . . . and label name as well as the expected date of initial distribution of phonorecords already made (if any) or expected to be made under the compulsory license;". *Id*. at §201.18 (d)(v)(E)(F)(G).

None of the NOI's issued by Music Reports, Inc. and provided to me for review in this case meet these requirements. For example, a copy of one such NOI is attached hereto as Exhibit A. This notice is similar to all the MRI notices produced by Apple. Such NOI lists "Various" for catalog numbers, "Various" for recording artist name, and "Various" for the label names:

| Artist(s): | Various |
|---|---|
| Catalog number(s): | Various |
| Label name(s): | Various |
| Signature by Licensee: | Music Reports, Inc. o/b/o Licensee<br><br>By: *[signature]*<br><br>Music Reports, Inc. is authorized to execute this Notice of Intention on behalf of Licensee.<br><br>Dated: June 27, 2019 |

Moreover, Schedule A attached to the NOI fails to list either the catalog numbers, artist names, or label names of the phonorecords purportedly associated with the musical works listed therein, and fails to identify any phonorecords already made under this compulsory license. The same is true for each purported NOI produced by Apple.

The omission of the catalog number, recording artist name, and label name is not a harmless error, as it materially affects the adequacy of the information required to serve the purposes of Section 115 of the Copyright Act. As noted, Section 115(a), contains material eligibility requirements for obtaining compulsory licenses, including that the

-23-

musical works embodied in sound recordings were lawfully fixed and duplicated. Without the NOI listing the catalog number, recording artist name, or label name associated with the musical work for which the license is sought, there is no way for a musical composition copyright owner to track the recordings made available pursuant to the license or to track corresponding payments. The musical composition copyright owner that receives an NOI that states "Various" for label name, recording artist, and catalog number, has no idea which recordings of the copyright owner's song are being sold, by what labels, and on what albums because no sound recording, album, catalog number, or record label is identified in the NOI. A harmless error could be, for example, a typographical error in the catalog number or label name, but not the absence of the required information altogether.

### 3. *NOI's Were Served After the Making and Distributing of the Phonorecords*

To the extent that Apple reproduced or distributed permanent downloads of Plaintiffs' musical compositions prior to serving the NOI, the NOI is invalid *ab initio*. Under Section 115, a Notice of Intention must be served "before or within thirty days after making, but before distributing any phonorecords of the work." 17 U.S.C. §115(b)(1) (pre-2018 Act). I understand that many of the NOI's produced by MRI on behalf of Apple bore an "Expected Date of Distribution" prior to the time Apple first reproduced and made available the musical works for the type of phonograph configuration purported to be covered by the NOI (i.e., "Digital Phonorecord Deliveries"). I understand that, in most instances, Apple ingested the recording, made server copies, and sold a copy to one of its customers before MRI sent a notice for the composition embodied on the recording. Accordingly, in these cases it appears clear that such purported NOI's failed to effectuate a license for any form of digital phonorecord delivery, neither permanent downloads nor

interactive streams, since Apple began making copies of such musical works before MRI sent the NOI's.

Failure to serve or file the NOI on a timely basis "forecloses the possibility of a compulsory license" and in the absence thereof the making and distributing of phonorecords of unlicensed musical works are actionable as acts of infringement. 17 U.S.C. §115(b)(2) (pre-MMA). "Copyright and the Music Marketplace," *U.S. Copyright Office* at 132 (Feb 2015). This means that, if Apple failed to serve a timely NOI for a given composition, it would be forever precluded from licensing that work under Section 115.

## E.    Limited Quantity Licenses for Permanent Digital Downloads Did Not Effect Mechanical Licenses for Permanent Digital Downloads Delivered Prior to the License Date

The limited quantity licenses from HFA that were obtained by Adasam after the lawsuit was filed are also invalid. As noted above, HFA licenses are issued pursuant to Section 115 of the Copyright Act which requires that they be obtained *before* or within 30 days after distribution begins. Adasam only began applying for HFA licenses in 2019, after they were sued, and years after they began distributing the recordings. You can't infringe for years and then apply for an HFA license once you get sued to escape liability because the licenses are prospective only. In addition, HFA licenses expressly adopt the language of Section 115 which of course includes a requirement that the sound recordings be lawfully fixed and duplicated with the consent of the copyright owner of the sound recording. To the extent that all the Adasam recordings were pirated, Adasam was not eligible for a HFA license for any of them in the first place (even prospectively).

### F.       No Evidence of Import Authorization

Here, the content providers that delivered recordings to Apple (Genepool, Adasam, and the Pickwick entities) were all located outside the United States, either in the United Kingdom or Australia. In addition, I understand that Apple was provided with foreign business address for all the relevant providers and that virtually all of the recordings at issue were delivered to Apple with an ISRC code containing the prefix "GB", indicating that Great Britain was the country of origin for the registrant.[23] Under these circumstances, Apple should have realized that it was required to obtain authorization from Plaintiffs to import their works under Section 602 of the Copyright Act. I am advised that Plaintiffs never agreed to the importation and that Apple has not produced any evidence of its authorization to import these works. Apple, Genepool, Pickwick and Adasam, all failed to obtain authorization to import copies of the Plaintiffs' musical compositions for all of the tracks at issue, which is required under 17 U.S.C. § 602. This is an additional act of infringement.

### G.       Existing Negotiated Mechanical Licenses, including Pass-Through Licenses, Could Not Be Reasonably Relied Upon

#### 1.       *Pass-Through Licenses Not Likely to be Effective for Permanent Downloads*

A mechanical license obtained by a record company in one of the following two ways may be "passed-through" to Apple: (a) a negotiated mechanical license from a music publisher or its agent (b) a license directly from recording artist who "controlled" the

---

[23] The ISRC (International Standard Recording Code) is the international identification system for sound recordings.  Each ISRC is a unique and permanent identifier for a specific recording, independent of the format on which it appears (CD, audio file, etc.) or the rights holders involved. The first two-character segment is determined by the registration authority to which the applicant applied for the ISRC and will not change if the recordings are changed in another country.

subject musical compositions. It has long been known that neither of these forms of purported pass-through licenses could be reasonably relied upon.

I founded EMusic.com, Inc. in December 1997 and the company began selling permanent downloads of sound recordings embodying musical works in July 1998, five years prior to Apple's launch of its download service in the United States. EMusic went public in 1999 and its shares were traded on NASDAQ under the symbol EMUS. By the time the company was sold to Universal Music in 2001, we had licensed over 1 million sound recordings, including all the musical works underlying those recordings.

When considering a strategy to assure EMusic had obtained the mechanical licenses required to engage in the permanent downloads of musical works embodied in the recordings that we had licensed from record companies, we were mindful of the fact that, unlike a distributor or retailer of physical CDs purchased from a record company, EMusic itself was engaged in the *reproduction* of the musical works and we were aware of the consequences for making reproductions of copyrighted musical works without a valid reproduction license.

For this reason, we were skeptical of sound recording owners who tried to assure us that they had already obtained mechanical licenses that, if "passed-through" to us, would enable EMusic to make and distribute their sound recordings by digital phono record delivery and we would not rely on any warranty or representation to that effect.

**(a)     Most Existing Mechanical Licenses Issued by Harry Fox Agency Were Ineffective for Digital Phonorecord Deliveries**

EMusic did not believe we could rely on most, if not all, of the mechanical licenses issued to record companies by the Harry Fox Agency, because such licenses were

customarily limited to the specific edition of the sound recording licensed, if not by record number or master number, then by the applicable physical configuration (e.g., vinyl album, cassette, or CD). Such licenses, by their express terms, would not permit reproduction by digital phonorecord delivery. Thus, such licenses (e.g., mechanical licenses permitting the making and distribution of CDs) could not be "passed-through" to Apple for purposes of making digital phonorecord deliveries.

**(b)     Mechanical Licenses Issued by "Controlled-Composition" Clauses in Recording Artist Contracts Were, In Practice, Unverifiable and Unreliable**

Record companies may have obtained many mechanical licenses for its distribution of phonorecords through "controlled-composition" clauses in their contracts with recording artists who also wrote the songs they recorded.[24] These licenses in theory could be passed through to the digital music provider for the making and distribution of digital phonorecord deliveries. However, such license would only be effective to the extent the recording artist did, in fact, control the music publishing rights in the subject musical work. The controlled-composition clause could not grant a mechanical license for the distribution of, for example, a "cover" record of a song owned by a third party.

Where the artist made a "cover" recording of a musical work, the mechanical license the record company obtained would have been, not pursuant to an artist's recording contract, but pursuant to a form used by a music publisher or the Harry Fox Agency. As noted, mechanical licenses issued by music publishers and the Harry Fox Agency typically authorized only a specific edition of the sound recording licensed, or identified by the

---

[24] None of the musical compositions at issue in this case can be controlled compositions because the composers of the works are not the recording artists.

physical configuration (e.g., CD).[25] These existing mechanical licenses would not have authorized digital phonorecord deliveries and could therefore not have been passed-through to Apple for such purpose.

At EMusic, we believed that extensive due diligence would be required to determine if, in fact, a record company had a valid controlled-composition clause in place with a recording artist/songwriter that would enable the pass-through of the record company's mechanical license to EMusic for making and distributing digital phonorecord deliveries. The fact that record companies considered the recording agreements with their artists highly confidential made such due diligence impractical.

Moreover, mechanical licenses a record company may have obtained from a songwriter through a "controlled-composition" clause in a contract with a recording artist would not have applied to interactive streams, as such clauses would, in practice, limit such mechanical reproductions to physical product and permanent downloads. Controlled-composition clauses will typically fix the mechanical rate at some percentage of the statutory rate that was *effective on the date of the recording* of the song.[26] That rate may have been as low as 2 cents, and as high as 9.1 cents, per copy. As a practical matter, such license is entirely infeasible when applied to interactive streaming (particularly promotional clips for which Apple provides for free), as a single work may be interactively streamed by a user hundreds of times, which would make prohibitive the mechanical license fee due to the recording artist. These provisions could be renegotiated by record companies, but at great transaction costs.

---

[25] *See also*,

[26] For an example of controlled-composition clause in an recording artist contract, see *Kohn On Music Licensing*, 5th Edition at 863.

### 2.      *Pass-Through Licenses Not Effective for Interactive Streaming*

Pass-through mechanical licenses, even to extent they may be effective to permit *permanent downloads* of certain musical works, would not permit *interactive streaming* thereof at all. As the Court stated in Hammerstein in 2001, "Even if it were not clear that Defendants' licenses are limited by the particulars set forth in the Harry Fox license, it appears that even a compulsory license would not permit Defendants to stream these copyrighted works over the Internet." *Hammerstein* at 22.

Thus, for its interactive streaming service, Apple could not have relied on many, if not most, existing mechanical licenses that authorized the making and distributing of phonorecords, such as many of those procured by record companies. In *Hammerstein*, cited above, Universal Music contended that their existing mechanical licenses, many of which were acquired from the Harry Fox Agency, implicitly covered their reproduction of musical works onto servers to facilitate their streaming service. But the court ruled otherwise, holding that the licenses they received from the Harry Fox Agency were limited to specific edition of the sound recording licensed, identified by the physical configuration (e.g., CD) and record number, each specifically set forth in the mechanical license. *Hammerstein* at 16-24 (citing *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.* 958 F.Supp. 170 (1997), aff'd 155 F.3d 17 (2d Cir. 1998), which cited *Kohn On Music Licensing* on this point).

Ultimately, even the major record companies recognized the inefficacy of pass-through mechanical licensing and generally supported the elimination of pass-through licensing within the context of a structure that makes the practice unnecessary. See, "Copyright and the Music Marketplace," *U.S. Copyright Office* at 132 (Feb 2015).

### 3. Pass-Through Licenses Not Effective for Recordings Unlawfully Fixed

Mechanical licenses for digital phonorecord deliveries issued by the Harry Fox Agency incorporate by reference the terms of a Section 115 compulsory license and only vary the terms of the statutory license with respect to the Notice of Intention (i.e., the service of an NOI would not be required, the frequency of payment (i.e., quarterly rather than monthly), and additional minor provisions.

The Harry Fox Agency license does not vary the statutory requirements that the sound recording was lawfully fixed or duplicated.[27] Accordingly, even though a record company has purportedly obtained a mechanical license to make digital phonorecord deliveries, if the recordings covered by the purported license were not lawfully fixed or duplicated under the authority of the copyright owner of the recordings (i.e., "pirated" recordings), then the mechanical license would be invalid and could not be passed through to Apple.

## H. Effective Means of Avoiding Copyright Infringement

Music industry customs and practices for procuring mechanical licenses for digital phonorecord deliveries were developed and observed by digital music providers long before Apple launched iTunes. In my opinion, Apple failed to implement policies to avoid infringement.

### 1. Using In-house Staff to Ensure Effective License Procurement

Given our familiarity with music industry customs and practices and knowledge of the Copyright Act, the executives of EMusic, as early as 1997, were convinced that we could not rely on pass-through licenses from record companies or other prospective

---

[27] 17 U.S.C. 115(a)(1)(i) & (ii) (pre-2018 Act).

licensors of sound recordings without incurring a substantial risk of copyright infringement actions.

Accordingly, shortly after the launch of our service, EMusic established a written arrangement with the Harry Fox Agency in which the parties cooperated in building business and technical procedures for our procurement of the mechanical licenses we required for digital phonorecord deliveries. Those procedures included the submission and clearance of mechanical reproduction licenses on a "bulk" licensing basis. We worked with HFA such that we were able to submit license requests, and receive responsive licenses, in the thousands at a time.

Yet, knowing that the Harry Fox Agency did not represent all music publishers in the United States (estimated to represent only about 65% of them), EMusic hired an in-house staff—which eventually reached as many as 20 people— whose sole job it was to reach out to all other copyright owners whose musical works may be included in the sound recordings we had been licensing from record companies. Employment of this staff was a significant annual cost to EMusic's business, but an expense we believed was necessary and reasonable to eliminate our risk of engaging in copyright infringement on a song-by-song basis. EMusic thus reached out directly to many independent music publishers and music publishing administrators, small and large, particularly those in Nashville and other parts of the country, who were not members of the National Music Publishers Association or users of the Harry Fox Agency's services.

By 2001, we had licensed from over 1,000 record companies over 1 million sound recordings, which required a commensurate number of licenses for the musical works underlying those recordings. Yet, we succeeded in procuring from hundreds of these non-

HFA affiliated music publishers the mechanical and server copy licenses we required to offer digital phonorecord deliveries of such works.

Thus, as early as 1998, EMusic established as a matter of practice of not relying on pass-through licenses from licensors of sound recordings and using an in-house staff dedicated to procuring the required mechanical licenses. This would be the custom and practice of music service providers, at least as early as 1998, who recognize their obligations to respect the copyrights of works they seek to exploit with their services.

### 2. Putting "On-Hold" and Not Releasing Unlicensed Recordings

In addition to devoting in-house resources to procure the mechanical licenses it required to make digital phonorecord deliveries, EMusic established a procedure under which any sound recording placed on our servers that contained a musical work for which we had not obtained a mechanical license was put "on hold," meaning it would not be released for permanent download until such mechanical license had been procured.

Technically, this was a straightforward procedure, because we could control the status of each track through *metadata* we created for this purpose. The key was establishing proper communication between those at EMusic involved with clearing the mechanical licenses and those controlling the metadata. That communication was established because EMusic management had the will to do it. There was no, and is no, technical or workflow barrier to putting recordings "on hold" when a service lacks the required license to release it.

Thus, as early as 1998, EMusic established as a matter of practice of communicating mechanical license status information to its technical staff and the withholding of transmission of recordings containing musical works for which valid

mechanical licenses were not in place. This would be the custom and practice of music service providers who recognize their obligations to respect the copyrights of works they seek to exploit with their services.

By contrast, Apple apparently relied solely on: (a) the representations and warranties of its content providers that the content was fully licensed; and (b) its MRI licensing efforts to obtain mechanical licenses by serving statutory notices under Copyright Act Section 115, all without verifying the providers' rights to distribute the recordings or even completing the purported NOI's with the required information (e.g., artist and label names and catalog numbers). For the foregoing reasons, Apple's policy of relying on pass through licenses from its content providers is reckless and certain to result in copyright infringement.

### 3.    *Due Diligence Review of Distributors' Applications*

Shortly after I founded EMusic, my executive team promptly began hiring a staff of content acquisition personnel who had previously served in roles in major and independent record companies as either "Business Affairs" or "Artist & Repertoire ("A&R") executives. The objective of this staff was to seek licenses of sound recordings offered by reputable owners of sound recordings, primarily major and independent record companies. We were quite aware of the enormous amount of piracy the recording industry suffered over the years from unscrupulous "pirates" and we foresaw the possibility that these same entities might see digital distribution as another opportunity for wrongdoing. With that in mind, even though our standard content acquisition form required that the provider represent and warrant to us that they had the right to license the recordings to us, we could not risk relying solely on a contractual provision to protect us, as one cannot

"squeeze blood from a turnip."   Accordingly, to avoid acquiring catalogs pirated from legitimate record companies and risk suffering the grave consequences of being charged as infringers ourselves, we hired music industry professionals who would have a better chance of separating the legal wheat from the pirated chaff.

As a result of these policies, much of the content EMusic acquired was the result of the prior relationships that our content acquisition staff had previously established with the proprietors of the record companies who provided us with legitimate licenses. Where we had no prior personal relationships, our staff would as a matter of practice speak directly with the proprietors and independently verified their veracity or reputation with other record companies or record company associations, such as the Recording Industry Association of America (RIAA), the American Association of Independent Record Companies, (A2IM), and their counterparts overseas, such as the British Phonographic Industry Association (BPI) and the Association of Independent Music (AIM).

I have reviewed a screenshot showing the information submitted by Pickwick Group Ltd. in its application to Apple to become a provider of sound recordings to the iTunes Store. APL-PICK_00005938, a copy of which is attached as Exhibit B. I understand that prior to Apple's approval of the application, Apple did not interview, or otherwise engage in human interaction, with Pickwick or the other defendants in this action prior to accepting their sound recordings to the iTunes Store. Nor did Apple seek any other independent verification of the information provided to it as reflected in the screenshot.

In my view, given the high likelihood that unscrupulous individuals on the periphery of the record industry would seek to take advantage of the relative anonymity

that Apple let them enjoy, Apple's procedures for vetting the legitimacy of the content it released in the iTunes Store was grossly inadequate and reckless.

**I.     Apple Continued to Reproduce and Digitally Distribute Plaintiff's Copyrighted Works Even AFTER it received Multiple Notices from the Owners of Sound Recordings to Cease and Desist the Unauthorized Reproduction and Distribution of Such Recordings**

I have reviewed the declarations submitted by representatives of Warner Music Group, Universal Music Group, Sony Music Entertainment, Concord Records, and BMG Rights Management, all to the effect that none of these owners of sound recordings have any record of authorizing the Defendants to offer the subject sound recordings for digital phonorecord delivery by Apple or anyone else.

Moreover, I understand that that these record companies have issued "take down" notices to Apple on thousands of occasions over a period of 10 years requesting that recordings from Adasam, Pickwick and Ideal/Genepool be removed from the iTunes Store, and that despite this, Apple continued to offer new contracts to these content providers and did not terminate their business relationship with Genepool until they were sued in 2019, and did not terminate their business relationships with Adasam and the Pickwick entities until after Apple was sued in 2020 for the content they provided.  Further, Adasam and Pickwick were specifically identified as bootleggers in a 2012 class action against Apple, *Blagman v. Apple, et. al.* and yet Apple never terminated them as providers.

Some of the takedown notices evince egregious conduct on the part of Apple. For example, Apple produced documents in the Pickwick case relating to Takedown iTS13168 which it received in 2011. (APL-PICK_5722-5734). This takedown alone includes over 400 pirated tracks identified by RIAA, including the cast album for West Side Story and

hundreds of recordings by artists such as Harry Belafonte, Johnny Mathis, and Miles Davis. This one notice includes tracks delivered to Apple by all three of the relevant providers (Pickwick – 315 tracks, Adasam – 98 tracks, Genepool – 51 tracks). Apple continued to allow these providers to sell content on iTunes for years after this notice – and continued to enter new contracts with them - even after this notice.

In some instances, Apple received multiple complaints about the same content. For example, Apple received multiple complaints from Eric Records about Adasam repeatedly posting the same unauthorized content to iTunes. *See* Cook Deposition Exhibits 45-46. In fact, the complaint specifically advised Apple that it was "abundantly clear that they are pirating pre-1972 music" but Apple continued to sell Adasam content on iTunes in blatant violation of the copyrights in both the recordings and their underlying musical works. Apple only terminated Adasam after this was filed. Apple was advised of a widespread problem of Adasam, Pickwick and Genepool/Ideal pirating pre-1972 recordings but its reaction showed a willful blindness to the infringements and reckless disregard of Plaintiff's copyrights.

**J.    Apple's Conduct Is Willful**

In my opinion, Apple's infringements of Plaintiffs' copyrights is willful. Apple could not (i) reasonably rely on pass-through or existing negotiated mechanical licenses, or (ii) rely on Notices of Intention it served after the date of first distribution of the recordings on which it sought compulsory licenses. In addition, Apple failed to (iii) properly vet its content providers before granting them access to sell pirated recordings in the iTunes music store; (iv) reasonably respond to thousands of notices from owners of sound recordings that phonorecords of such recordings were unlawfully provided to Apple

for digital phonorecord deliveries, or (v) employ technical and management capability to prevent the unauthorized release or withhold the streaming of Plaintiff's unlicensed works. Finally, Apple (vi) was aware of the potential consequences of not procuring such licenses, including maximum allowable statutory damages for willful infringement.

In *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335–36 (9th Cir. 1990), the "court found the infringements were willful because . . . defendants received the December 26, 1984 notice of termination, failed to account for and pay royalties, yet nevertheless continued to manufacture and distribute phonorecords."

Moreover, "A copyright infringement is willful within the meaning of 504(c)(2) for purposes of enhancing statutory damages if a defendant knew that his or her actions constituted an infringement."

- "[K]nowledge may be actual or constructive."

- "[R]eckless disregard of the copyright holder's right (rather than actual knowledge of infringement) suffices to warrant award of the enhanced damages."

*Peer Int'l Corp.*, 887 F. Supp. at 568 (citations omitted).

All of the facts that have allowed courts to infer willfulness—industry experience; prior lawsuits regarding similar practices; and specific warnings—are present in this case. Apple is an experienced and sophisticated digital music service. See, *Peer Int'l Corp.*, 887 F. Supp. at 568 ("[A]s an experienced musical publisher 'for about 10 to 12 years,' who distributed 'all the major labels of Spanish music,' [defendant's] conduct in ignoring the revocation of [plaintiffs'] license demonstrates if not actual knowledge, reckless disregard for plaintiffs' copyrights.") (citation omitted).

Willful infringement is supported by the specific, multiple warnings Apple received from [owners of sound recordings] for nearly ten years. *See, Broadcast Music, Inc. v. R Bar of Manhattan, Inc.*, 919 F. Supp. 656, 660 (S.D.N.Y. 1996) (finding willful infringement where the record companies' "representatives wrote to defendants on ten occasions and spoke with persons associated with the establishment's operation over 20 times").

Each of Plaintiff's "separate copyrighted works constitutes one work for purposes of [17 U.S.C.] § 504(c)" which "warrants [493] statutory damage awards." *WB Music Corp. v. RTV Commc'n Grp., Inc.*, 445 F.3d 538, 541 (2d Cir. 2006). 17 U.S.C. § 504(c) sets a damages range of $750 to $30,000 per infringed work, but allows for a range of $30k-$150k per work if the infringement is "committed willfully." *See, Pausa Records, Inc.*, 909 F.2d 1332 (upholding an award of maximum statutory damages in an action involving a corporation's willful infringement by continuing music sales after termination of its license).

## IV. PUBLICATIONS AUTHORED WITHIN THE PRECEDING 10 YEARS

The following is a list of all publications authored by me within the preceding 10 years:

- "How Book Publishers Can Beat Amazon," *New York Times* (May 30, 2014)

- *Kohn On Music Licensing, 5th Edition* (Wolters Kluwer 2019)

- *How To Build a Friendly Robot* (Theoria Books, 2019).

## V.  DATA OR OTHER INFORMATION CONSIDERED
## IN FORMING THESE OPINIONS

The data or other information I considered in forming these opinions include:

- Complaint and other Pleadings in this action
- Various MRI compulsory license notices produced by Apple in the three lawsuits;

- Various "Limited Quantity License for Permanent Digital Downloads" purported to have been obtained by Adasam after the laswsuit was filed;

- Screenshots of Apple's online distributor application and the Pickwick application;

- Declarations provided by representatives of major record labels (Sony, Universal, Warner, Concord, and BMG);

- Various digital music distribution contracts between Apple and Adasam, Genepool, and Pickwick


## VI.  EXPERT WITNESS FEE

My fees for services rendered as an expert witness in this case is a flat fee of $15,000 for this expert witness report. Thereafter, for services rendered $650.00 per hour, provided that such fee shall be $950 per hour for deposition and trial testimony.

## VII.  INTENDED TRIAL EXHIBITS AND SUPPLEMENTATION

At trial, I reserve the right to use all materials considered in preparing this report, including without limitation the materials set forth in the foregoing sections.

I understand that additional reports and depositions of experts and other witnesses may be conducted in this matter.  I plan on reviewing their deposition transcripts when they

become available and reserve the right to supplement or amend this report after such review.

Finally, I reserve the right to supplement or modify this report and the opinions expressed based upon additional facts, documents, or other materials that may be brought to my attention.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my ability and that this report was executed on the date set forth below in Shelter Island, NY.

Respectfully submitted,

September 3, 2021

_____
Robert H. Kohn

Exhibit A




204126-691545-1350
1191-D-INS1

Attn: Statutory Licensing Division (AI)
21122 Erwin St.
Woodland Hills, CA 91367

June 27, 2019

**Re:**  **Notice of Intention to Obtain a
Compulsory License**

S.A. MUSIC COMPANY
200 Old Country Road, Suite 274          01191
c/o ERNEST D. LOEWENWARTER & CO.
Mineola, NY  11501-4240

Dear Music Publisher:

  We are contacting you on behalf of our client Apple / iTunes, which has engaged us to secure and administer mechanical rights for certain portions of its music service.

  Your musical works are associated with one or more of the sound recordings that our client would like to include in its music service in the form of streaming promotional clips of up to 90 seconds. We are sending you the enclosed Notice of Intention to Obtain a Compulsory License for Making and Distributing Phonorecords ("NOI") to ensure that a proper license is in place for your musical works. **If you have any questions, please visit the FAQ section at www.musicreports.com.**

  **You do not need to acknowledge this letter or send us anything for the compulsory license to apply.** However, *in order to ensure that your song information is properly reflected in our system*, we strongly recommend you check the enclosed NOI and its Schedule A for factual errors. **If you would like to update your contact or song information, or to send us a complete listing of your catalog data,** please email us at shareinfo@musicreports.com.

---

### Opt-in to Receive Electronic NOIs from Music Reports!

  You can opt to have future NOIs posted to your web account, where they will be available to you online 24x7 and downloadable in spreadsheet format. Electronic NOIs are easier to administer because they may be sorted, copied and stored electronically. If you choose to receive NOIs electronically, you will no longer receive these paper notices by mail.  **When you next log in to your web account, navigate to the "Go Green" tab of your "Account Details" section and follow the instructions to opt in to electronic NOIs.**

---

APL-ADASAM_00002588

(THIS PAGE LEFT INTENTIONALLY BLANK)

APL-ADASAM_00002589

## Notice of Intention to Obtain a Compulsory License
## for Making and Distributing Phonorecords

Pursuant to 17 U.S.C. § 115(b) and 37 C.F.R.  201.18, this Notice, including the attached Schedule A, entitles  to make and distribute phonorecords via the full range of distribution methods available pursuant to 17 U.S.C. § 115 of the United States Copyright Act.

| | |
|---|---|
| Name of Licensee: | Apple / iTunes |
| Address and Telephone number of Licensee: | 1 Infinite Loop, MS:65-EC<br>Cupertino, CA  95014<br>(408) 996-1010 |
| Name and title of the person responsible for the management of the Licensee: | Eddy Cue<br>Vice President of Internet Services |
| Fiscal Year of Licensee: | Fiscal year ending September 25. |
| Title of musical work: | See Schedule A |
| Author(s): | See Schedule A |
| Copyright Owner(s): | See Schedule A |
| Phonorecord configuration(s): | Digital Phonorecord Deliveries, as set forth in 17 U.S.C. § 115 including, but not limited to, interactive streams and limited downloads. |
| Expected date of initial distribution: | July 7, 2019 |
| Artist(s): | Various |
| Catalog number(s): | Various |
| Label name(s): | Various |
| Signature by Licensee: | Music Reports, Inc. o/b/o Licensee<br><br>By: <br><br>Music Reports, Inc. is authorized to execute this Notice of Intention on behalf of Licensee.<br><br>Dated: June 27, 2019 |

**PLEASE ADDRESS ALL CORRESPONDENCE REGARDING THIS NOTICE TO:**
Music Reports, Inc.
Attn:  Statutory Licensing Division
21122 Erwin Street
Woodland Hills, California 91367
Telephone: (818) 558-1400
E-mail:  shareinfo@musicreports.com

APL-ADASAM_00002590

| Schedule A | | |
|---|---|---|
| **Title** | **Author(s)** | **Copyright Owner(s)** |
| ANY PLACE I HANG MY HAT IS HOME | ARLEN, HAROLD~/~MERCER, JOHNNY | S.A. MUSIC LLC |
| AS LONG AS I LIVE | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |
| BETWEEN THE DEVIL AND THE DEEP BLUE SEA | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |
| BREAKFAST BALL | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |
| CAKE WALK YOUR LADY | ARLEN, HAROLD~/~MERCER, JOHNNY | S.A. MUSIC LLC |
| COME RAIN OR COME SHINE | ARLEN, HAROLD~/~KEITH, JOHN~/~MERCER, JOHN H~/~MERCER, JOHNNY~/~MOORE, JOE~/~MOORE, JOHN | S.A. MUSIC LLC |
| COME RAIN OR COME SHINE | ARLEN, HAROLD~/~MERCER, JOHNNY | S.A. MUSIC LLC |
| EVALINA | ARLEN, HAROLD~/~HARBURG, E.Y. | S.A. MUSIC LLC |
| EVELINA | ARLEN, HAROLD~/~HARBURG, E.Y. | S.A. MUSIC LLC |
| FIRST YOU GAVE ME HIGH THEN | ARLEN, HAROLD~/~BROWN, LEW | S.A. MUSIC LLC |
| GET HAPPY | ADES, HAWLEY W~/~ARLEN, HAROLD~/~BABY, (B) LILIAN~/~BABY, LILIAN~/~BONELLI, GINO~/~DIETZ, HOWARD~/~FRANCIS, ARTHUR~/~GERSHWIN, GEORGE~/~GERSHWIN, IRA~/~GERSHWIN, J IRA B~/~HARBURG, E Y~/~HOWARD, DICK~/~KOEHLER, TED~/~LACKENBACH, ROBINSON ARMIN~/~LACKENBACH, ROBINSON ARMIN (L)~/~LILIAN, BABY~/~ORTH, HERBERT~/~OSTWIG, HANS~/~PORTER, COLE~/~PSEUDO~/~REISCH, WALTER~/~ROBINSON, ARMIN~/~ROBINSON, ARMIN LOCKENDA~/~ROBINSON, LACKENBACH ARMIN L~/~ROSE, BILLY~/~ROXY(PGM, DPT)~/~ROXY, (DE 2)~/~SCHWARTZ, ARTHUR~/~STOLZ, ROBERT~/~WEINHAUSEN, FRITZ~/~YOUNG, JOE~/~YOUNG, JOSEPH | S.A. MUSIC LLC |
| GET YOURSELF A NEW BROOM | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |
| HARLEM HOLIDAY | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |
| HERE GOES (A FOOL) | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |
| HOORAY FOR LOVE | ARLEN, HAROLD~/~ROBIN, LEO | S.A. MUSIC LLC |
| I HAD MYSELF A TRUE LOVE | ARLEN, HAROLD~/~MERCER, JOHNNY | S.A. MUSIC LLC |
| I NEVER WAS BORN | ARLEN, HAROLD~/~HARBURG, E.Y. | S.A. MUSIC LLC |
| I WONDER WHAT BECAME OF ME | ARLEN, HAROLD~/~KEITH, JOHN~/~MERCER, JOHN H~/~MERCER, JOHNNY~/~MOORE, JOE~/~MOORE, JOHN | S.A. MUSIC LLC |
| I'VE GOT THE WORLD ON A STRING | ARLEN, HAROLD/KOEHLER, TED | S.A. MUSIC LLC |
| IN YOUR OWN QUIET WAY | ARLEN, HAROLD~/~HARBURG, E.Y. | S.A. MUSIC LLC |
| IT'S ONLY A PAPER MOON | ARLEN, HAROLD~/~HARBURG, E. Y.~/~ROSE, BILLY | S.A. MUSIC LLC |
| ITS ONLY A PAPER MOON | ARLEN, HAROLD~/~HARBURG, E Y~/~ROSE, BILLY | S.A. MUSIC LLC |
| LAST NIGHT WHEN WE WERE YOU | ARLEN, HAROLD~/~HARBURG, E Y | S.A. MUSIC LLC |
| LAST NIGHT WHEN WE WERE YOUNG | ARLEN, HAROLD/HARBURG, E.Y. | S.A. MUSIC LLC |
| LEGALIZE MY NAME | ARLEN, HAROLD~/~MERCER, JOHNNY | S.A. MUSIC LLC |
| LEGALIZE MY NAME | ARLEN, HAROLD~/~MERCER, JOHNNY | S.A. MUSIC LLC |
| LET'S PUT OUR HEADS TOGETHER | ARLEN, HAROLD~/~HARBURG, E.Y. | S.A. MUSIC LLC |
| LOVE'S A NECESSARY THING | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |
| LULLABY | ARLEN, HAROLD~/~HARBURG, E.Y. | S.A. MUSIC LLC |
| MINNIE THE MOOCHER'S WEDDING DAY | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |
| ONE LOVE | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |
| OPENING MEDLEY | ARLEN, HAROLD~/~EBB, FRED~/~GERSHWIN, GEORGE~/~GERSHWIN, IRA~/~KANDER, JOHN~/~KOEHLER, TED~/~MERCER, JOHNNY | S.A. MUSIC LLC |
| RAIN | ARLEN, HAROLD~/~BACHARACH, BURT F~/~BROWN, NACIO HERB~/~BULLOCK, JACK~/~CASA, DAVID LP~/~DAVID, H L~/~DAVID, HAL~/~FREED, ARTHUR~/~KEITH, JOHN~/~MERCER, JOHN H~/~MERCER, JOHNNY~/~MOORE, JOE~/~MOORE, JOHN | S.A. MUSIC LLC |
| ROCKIN IN RHYTHM | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |

204126-6@1545-1350

APL-ADASAM_00002591

| Schedule A | | |
|---|---|---|
| **Title** | **Author(s)** | **Copyright Owner(s)** |
| SAY WHO SAYS YOU SAYS I | ARLEN, HAROLD~/~MERCER, JOHNNY | S.A. MUSIC LLC |
| SHAME ON YOU | ARLEN, HAROLD~/~HEYMAN, EDWARD | S.A. MUSIC LLC |
| SHOEIN THE MARE | ARLEN, HAROLD~/~GERSHWIN, IRA~/~HARBURG, E.Y. | S.A. MUSIC LLC |
| SUNDAY IN CICERO FALLS | ARLEN, HAROLD~/~HARBURG, E.Y. | S.A. MUSIC LLC |
| THAT'S WHAT I HATE ABOUT LOVE | ARLEN, HAROLD~/~KOEHLER, TED | S.A. MUSIC LLC |
| WHAT CAN YOU SAY IN A LOVE SONG | ARLEN, HAROLD~/~GERSHWIN, IRA~/~HARBURG, E.Y. | S.A. MUSIC LLC |
| WOMAN'S PEROGATIVE, A | ARLEN, HAROLD~/~MERCER, JOHNNY | S.A. MUSIC LLC |
| YOU SAID IT | ARLEN, HAROLD~/~YELLEN, JACK | S.A. MUSIC LLC |
| YOU'RE THE CURE FOR WHAT AILS ME | ARLEN, HAROLD~/~HARBURG, E.Y. | S.A. MUSIC LLC |

204128-691545-1350

APL-ADASAM_00002592

# Exhibit B

| DJ | Release Id | List Releases · Enable Uber View | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Misc | Pricing | Content Processing | Editorial | Localization | Content Providers | All Releases | Reindexing | Content Operations |

Home › Content Providers › New DC Applicants › Music › Search Music Applications

### Inspect **MZContentProviderSignupMusicApplication**

| | |
|---|---|
| **Legal Name** | Pickwick Group Ltd |
| **Seller US Tax Id** | o(Yup*I+LBujDgu |
| **Applicant State** | Hidden |
| **Contact Name** | Ray Hartley |
| **Title** | Owner |
| **Email** | ray@pickwickgroup.com |
| **Website** | http://pickwickgroup.com |
| **Work Phone** | +44 1494 732800 |
| **Mobile Phone** | |
| **Address Line1** | Merritt House |
| **Address Line2** | Hill Avenue |
| **Address Line3** | |
| **City Name** | Amersham |
| **Zip** | HP6 5BQ |
| **State** | - none - |
| **Country** | United Kingdom |
| **Distribution Territories** | Worldwide |
| **Dj Genre Display String** | Opera, Children's Music, Comedy |
| **Artists** | Pickwick |
| **Additional Information** | Popular titles produced by Pickwick over the past 40 years. Many classical and shows along with To |
| **ISRC Registration Number** | LGL |
| **Number Of Albums** | 1000 |
| **Number Of Tracks** | 12000 |
| **Number Of Videos** | 500 |
| **Application Date** | 04/26/2012 05:16:20 |
| **Label Rep Name** | |
| **Application Type** | A |
| **Related App Status** | |
| **Existing Content Provider** | |
| **Last Modified** | 05/29/2012 05:35:54 |
| **History** | Pending Review for Music by: hallie_peterson on: 2012-04-30 21:57:18 Etc/GMT<br>Hidden for Music by: meister.s on: 2012-05-29 12:35:54 Etc/GMT |

CONFIDENTIAL


Add Note

Return

APL-PICK_00005939