# EXHIBIT 9

Page 1

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4  _____

                                 )

5  S.A. MUSIC, LLC, et al.,       )

                                 )

6           Plaintiffs,           )

                                 )

7  vs.                            ) No. 20-cv-2146-WHO

                                 ) No. 20-cv-2794-WHO

8  APPLE, INC., et al.,           ) No. 20-cv-2965-WHO

                                 )

9           Defendants.           )

   _____)

10

11

12

13

14

15      VIDEOTAPED REMOTE DEPOSITION OF BOB KOHN

16             Shelter Island, New York

17           Wednesday, November 10, 2021

18                   Volume I

19

20

21  Reported by:

    CATHERINE A. RYAN, RMR, CRR

22  CSR No. 8239

23

24

25

1            UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3

4    _____

                                  )
5    S.A. MUSIC, LLC, et al.,        )
                                  )
6            Plaintiffs,             )
                                  )
7    vs.                           ) No. 20-cv-2146-WHO
                                  ) No. 20-cv-2794-WHO
8    APPLE, INC., et al.,           ) No. 20-cv-2965-WHO
                                  )
9            Defendants.             )
    _____)

10
11
12
13
14            Videotaped remote deposition of BOB KOHN,
15    taken on behalf of Defendants, by way of
16    video-telecommunication with the Witness appearing
17    in Shelter Island, New York, beginning at 12:06 p.m.
18    and ending at 7:45 p.m., on Wednesday, November 10,
19    2021, before CATHERINE A. RYAN, Certified Shorthand
20    Reporter No. 8239.
21
22
23
24
25

```
 1    Rodgers & Hammerstein case provided full-length
 2    interactive streams of entire sound recordings,
 3    correct?
 4        A    Yes, and promotional clips, I believe.
 5    Okay.  I'll take that back.  I don't -- I don't
 6    quite remember that.
 7        Q    Okay.  So you're not sure of that?
 8        A    I'm not sure of that.
 9        Q    Okay.  Let's go to page 26 of your report,
10    and I'm looking at section F, "No Evidence of Import
11    Authorization."  You write that "... the content
12    providers that delivered recordings to Apple... were
13    all located outside the United States ..."  That's
14    the second line of the first sentence.
15        A    I see it.
16        Q    What's the source -- or let me ask you:
17    How do you know that?
18        A    Well, attached as an exhibit to my report,
19    as Exhibit B, is the -- apparently the sign-up page
20    for Pickwick music -- Pickwick group, and they
21    indicate that they are from United Kingdom.  And my
22    understanding is -- and I may have read it in the
23    complaint.  I'm not sure where I may have gathered
24    it -- two of the defendants in this case -- or the
25    other cases that are related.  I'm not sure -- are
```

```
                                            Page 88
 1   also located overseas.
 2         Q    Okay.  And is that the -- is that the --
 3   the entire source for your -- the assertion we're
 4   discussing?
 5         A    I'm not sure.
 6         Q    Are you -- are you aware of any other
 7   sources as you sit here today?
 8         A    As I sit here today, no.
 9         Q    You say that, quote:  "... I understand
10   that Apple was provided with foreign business
11   address for all" of "the relevant providers and that
12   virtually all of the recordings at issue were
13   delivered to Apple with an ISRC code containing the
14   prefix 'GB', indicating that Great Britain was the
15   country of origin for the registrant."
16              Do you see that?
17         A    Would you tell me what page that is?  I
18   just lost the page number while I was just looking
19   back.
20         Q    Right where we were, page 26.
21         A    Okay.  Thank you.
22         Q    Section F.  It's the next sentence in that
23   paragraph.
24         A    Yeah, I somehow learned that during the
25   course of this litigation.
```

```
                                               Page 89
1        Q     And how did you learn that?
2        A     Through discussion with counsel.  I don't
3    know whether that reveals attorney-client privilege
4    or not, but ...
5        Q     Well, if it's in -- if it's in your report
6    and it's something you relied on to put in the
7    report, then I'm entitled to ask about it.
8        A     Okay.  I might have been shown documents
9    to this effect.  I'd have to go look at my -- I -- I
10   received a lot more documents than what is attached
11   to this report.  So let me go -- let me think back.
12           I'd have to go back and look at all the
13   documents, but I got it from somewhere.
14       Q     Okay.  But as you sit here now, other than
15   discussions with counsel, you can't recall a
16   different source?
17       A     Correct.
18       Q     You go on to say, Mr. Kohn:  "Under these
19   circumstances, Apple should have realized that it
20   was required to obtain authorization from Plaintiffs
21   to import their works under Section 602 of the
22   Copyright Act."
23           Do you see that?
24       A     Right.
25       Q     If Apple required its content providers to
```

1   represent and warrant that they had the rights to

2   distribute the sound recordings it was uploading in

3   the territories it designated, why do you say Apple

4   should have known that it was required to obtain

5   import authorization?

6          MR. SCHWARTZ:  Scott, if you wouldn't mind

7   doing that question again, because the way you asked

8   it, you said -- you had plural, and then you said

9   "it," so I don't -- it's not clear who you're

10  referring to.  You said -- you asked about the

11  providers --

12         MR. EDELMAN:  Right.

13         MR. SCHWARTZ:  -- it --

14         MR. EDELMAN:  I understand.  I should have

15  said "they."  So let me rephrase it.

16     Q    If Apple required its content providers to

17  represent and warrant that they had the rights to

18  distribute the sound recordings they were uploading

19  in the territories they designated, why do you say

20  Apple should have known that it was required to

21  obtain import authorization?

22     A    Okay.  Well, there's two parts to that

23  question, and the first part has to do with if Apple

24  required reps and warranties?

25     Q    Correct.

Page 216

```
1    2003 and 2010, who put tracks on hold until they
2    obtained mechanical licenses to digital downloads?
3         A    You know, the one way to answer that
4    question is:  Yes.  All of them would -- or all of
5    them do that.  If they don't have a mechanical
6    license, at least you know that they shouldn't --
7    they should put it on hold, and if they didn't put
8    it on hold, they're going to be liable.  So --
9         Q    My question, though --
10        A    I -- yeah, if I don't have personal
11   knowledge of the -- of what's -- I don't know
12   whether you're asking about whether they have a
13   policy to put it on hold or whether they just simply
14   put it on hold or not.  I mean, I certainly have no
15   personal knowledge of whether somebody pushed a
16   button or changed the metadata to put a particular
17   track on hold or not when they have a mechanical
18   license.
19             I don't want to be misconstrued by
20   answering that question with you taking that and
21   saying, "Well, Mr. Kohn said there's no policy for
22   that," you know.  So I -- I don't follow what -- you
23   know, I just don't want to be misconstrued.
24             I don't have any personal knowledge of
25   anyone at any competitor of Apple or anyone else in
```

Page 217

1   a download -- or music service provider of pushing a

2   button or changing the metadata to put a track on

3   hold if they don't have a mechanical license.  I

4   would be shocked -- shocked if they didn't, because

5   the odds of someone having a track and they -- a

6   track that there's -- that they released and it

7   didn't have a mechanical license, I'd be shocked if

8   they -- if that didn't happen once out of several

9   million tracks.  It's going to happen.  It's just a

10  matter of odds.

11          So if you're asking me the probability, I

12  would say it's highly probable the answer is:  Yes,

13  they put a track on hold if they didn't have a

14  mechanical license.

15      Q    Yeah, I'm definitely not asking you about

16  probabilities, and I'm not asking you to speculate.

17  I'm focusing directly on your personal knowledge,

18  and I'm asking you if you are aware of digital

19  retail providers who had a policy of putting a track

20  on hold until they obtained a mechanical license.

21      A    I think all of them had that policy.

22      Q    And how do you know that?  Are you

23  familiar with the policies?

24      A    Because if -- if they didn't have that

25  policy, their policy would be to infringe

Page 218

1   copyrights.

2        Q    Okay.  Is that the entire basis for your

3   answer?

4        A    I think that if that were -- if it were

5   not Apple's policy to put a track on hold that it

6   knew it didn't have a mechanical license for -- all

7   right? -- and it didn't have that policy, they're

8   guilty of willful infringement, no doubt.  Slam

9   dunk.

10       Q    All right.  Other than your belief that

11  that would or should be their policy, do you have

12  any personal knowledge as to what the policies were

13  of any other companies between 2003 and 2010?

14       A    Yes.  I think the policy would be not to

15  infringe copyrights.  It doesn't mean that the

16  procedures were actually geared to achieving that

17  policy, but I'd be shocked if any of those

18  companies -- I mean, perhaps Napster had a policy of

19  infringing copyrights.  Perhaps MP3.com, at one

20  point, had a policy of infringing copyrights, but

21  everyone would have a policy of not infringing

22  copyrights, so it would be logical for me to assume

23  that just about everybody who's considered to be

24  legitimate would try -- would have a policy.

25            But that's not the question.  The question

1   really is whether they actually had procedures in

2   place that would live up to that policy or whether

3   they -- that policy was in lip service and a -- and

4   a policy in name only as opposed to a policy that

5   they strive to achieve.

6          Q     Let -- let me try it a different way.

7                Are you aware of any digital retailers

8   that -- between 2003 and 2010 who -- who still had

9   an in-house staff that would secure mechanical

10  licenses for digital downloads?

11         A     Yes.

12         Q     Which ones?

13         A     All of them, unless -- unless you're

14  saying to me that all of those companies didn't

15  procure mechanical licenses.  Somebody in the legal

16  departments of each of those companies that -- must

17  be responsible for making sure they procure

18  mechanical licenses.  They have to have -- they have

19  to have somebody.

20         Q     Well, holding -- holding sound recordings,

21  as you explain it, is only necessary if a digital

22  retailer is clearing the rights itself, correct?

23         A     I'm sorry.  Repeat that question.

24         Q     Holding sounds recordings is only

25  necessary if a digital retailer is clearing the

Page 220

```
 1   rights itself, correct?
 2        A     What was the first word?  "Holding"?
 3        Q     "Holding," yes.
 4        A     Holding what?
 5        Q     Holding sound recordings; in other words,
 6   not releasing them --
 7        A     Okay.
 8        Q     -- is only -- is only necessary if a
 9   digital retailer --
10        A     Let me just --
11        Q     -- is clearing the rights itself, correct?
12        A     No, no.  Wait.
13              What you're trying to say -- what you're
14   trying to ask -- so -- just so I get the question
15   clear -- is that putting a sound recording on hold
16   and not releasing it -- what's the rest of your
17   question?
18        Q     Is only necessary if a digital retailer is
19   clearing the rights itself?
20        A     What?  That's ridiculous.
21        Q     If a digital --
22        A     No --
23        Q     If a digital retailer is not clearing the
24   rights because it's relying on either reps and
25   warranties or pass-through license from whoever is
```

1    providing the content, it wouldn't put music on

2    hold, would it?

3         A    In -- suppose if the digit retailer has

4    received a notice from a major record company

5    saying, That's our recording and it was unlawfully

6    provided to you, and you're saying you don't have to

7    put it on hold.  You don't have to take it off

8    the --

9         Q    No, I didn't -- I obviously didn't build

10   that into my question.  That's your spin on my

11   question.

12        A    Yeah, but -- well, I'm not spinning your

13   question.  I'm just simply saying that it's

14   ridiculous to think that a digital retailer would

15   either do or have a policy of just putting something

16   online for which it knows it doesn't have a license,

17   whether it's a sound recording license or a

18   mechanical license.

19        Q    Are you aware --

20             MR. SCHWARTZ:  Scott, is now a good time

21   for a break?

22             MR. EDELMAN:  Yeah, just about.  Let me

23   just finish this -- this question.  I think this

24   will probably end this area.

25        Q    Are -- are you aware of a digital

                                        Page 222

1    retailer, between 2003 and 2010 -- and 2010, that

2    was not clearing rights by itself, that -- that --

3    that held music in the fashion that you've

4    described?

5         A    I think that that's a question I can't

6    answer because it's just -- I don't understand the

7    question.

8              MR. EDELMAN:  Okay.

9              THE WITNESS:  I mean --

10             MR. EDELMAN:  All right.  Let's take a

11   break.

12             THE WITNESS:  All right.

13             MR. EDELMAN:  All right.  We can come back

14   at 2:40?

15             THE VIDEOGRAPHER:  Okay.  We are going off

16   the record.  The time is 5:30 p.m., and this is the

17   end of Media Unit No. 4.

18             (Recess.)

19             THE VIDEOGRAPHER:  Okay.  We're going back

20   on the record.  The time is 5:42 p.m., and this is

21   the start of Media Unit No. 5.

22   BY MR. EDELMAN:

23        Q    All right.  In section 3 on pages 34

24   through 36 of your report, Mr. Kohn, you discuss

25   eMusic's practices with respect to due diligence of

Page 223

1    distributors' applications, correct?

2          A    Just a second.  I'm just turning to that

3    now.

4                Yeah, this talks about the content

5    acquisition -- acquisition personnel that we hired

6    at eMusic to be business affairs or A&R executives

7    from, you know, record companies to seek the

8    licenses of the sound recordings of suppliers, like

9    independent record labels, et cetera.

10         Q    And then at the top of page 36, you

11   conclude that, quote:  "Apple's procedures for

12   vetting the legitimacy of the content it released in

13   the iTunes Store was grossly inaccurate and

14   reckless."

15               Do you see that?

16         A    Yes, I see it.

17         Q    Is that conclusion based on -- well, let

18   me just ask you:  What -- what is -- is that

19   conclusion based on a comparison of Apple's

20   practices to anyone other than eMusic's?

21         A    That's a comparison of Apple's practices

22   with eMusic and Apple's practices with common sense.

23   The -- having a unknown foreign content provider

24   sign up to a website and then submitting content and

25   metadata without any human intervention, thousands

Page 224

1    of recordings, which are, obviously, the recordings

2    of someone else in the United States, such as

3    Ella Fitzgerald or Frank Sinatra, et cetera, on --

4    anyone at any legitimate service -- music service

5    provider would immediately recognize that they just

6    had an opportunity to look at what was being

7    uploaded, seeing that was -- those are unauthorized

8    sound recordings -- the sound recordings were being

9    pirated, and you cannot get a mechanical license

10   from unlawful and unauthorized recording.  No

11   pass-through license, no mechanical license, no

12   license whatsoever for the underlying musical work

13   in that situation.

14            And then you have the companies who own

15   the recordings, such as Universal, Warner Music

16   Group, and the others notifying Apple and Apple --

17   perhaps they took down those particular recordings

18   that were found out by Universal, but no

19   investigation was done of the suppliers of the

20   recording for the thousands of albums that they were

21   putting up into the system.

22            So it's just the opposite of what eMusic

23   did.  Not only do you not try to obtain mechanical

24   licenses, Apple appears to have built a system to

25   look the other way on purpose.  I mean, that's what

Page 225

1  is going on here.  The -- the system is designed to

2  look the other way.

3           I mean, that seems to be a business

4  decision.  You talk about -- you asked me about, you

5  know, eMusic versus Apple.  eMusic made a business

6  decision not to do full reliance, not to look the

7  other way and to spend resources in order to protect

8  the rights of the individ- -- of the underlying

9  musical works.  Apple ignored that custom and

10  practice and built another -- eMusic, as I pointed

11  out in my book, apparently was forced to do what it

12  did.  It accept [sic] pass-through licenses, but

13  eMusic -- even eMusic at that time, even if it

14  accepted pass-through licenses from some of the

15  larger independent record labels, would not, in a

16  million years, have accepted Ella Fitzgerald,

17  Frank Sinatra from some foreign, you know, record

18  label or purported record label or -- or certainly

19  what appeared to be a pirate from overseas.

20           So, you know, you don't have to just

21  compare it to eMusic.  It's the -- diametrically

22  opposed to what eMusic did.  It's just simply common

23  sense of what Apple did and that it was grossly

24  inadequate and reckless.

25           MR. EDELMAN:  All right.  I'm going to

Page 226

1  move to strike everything after your first sentence.

2  I'm not expecting Mr. Schwartz --

3            THE WITNESS:  I'm going to --

4            MR. EDELMAN:  -- not expecting

5  Mr. Schwartz to grant my motion.  It will be ruled

6  on another day.

7            MR. SCHWARTZ:  No, it won't, Scott.  I

8  just want to point out that it's improper for you to

9  do that.

10            During the break, I emailed you an article

11  that explains it in basic terms.  There is no basis

12  for a motion to strike.  It's obvious that you're

13  doing it solely to harass and intimidate the

14  witness.  It is the equivalent of saying to the

15  witness that what you just said is invalid, and

16  that's improper, and I would ask that you please

17  stop doing that.  There is no basis for it in the

18  federal rules, and your continued doing it is -- is

19  completely improper.

20            MR. EDELMAN:  I understand --

21            MR. SCHWARTZ:  If you have a question, ask

22  a question.

23            MR. EDELMAN:  I totally --

24            MR. SCHWARTZ:  He answered your question.

25            MR. EDELMAN:  I totally understand your

Page 231

1   and later it was Spotify -- who else was on the

2   list?  There was maybe Microsoft Zoom at the time.

3   There were a number of services that I became

4   familiar with the -- with the processes and

5   procedures for uploading on the services.

6           So my conclusion -- and I certainly

7   specifically remember what, you know, we were doing

8   at eMusic, and I mentioned in my last answer to the

9   question, which is virtually the same question,

10  common sense would suggest that -- from what I've

11  seen, how Apple chose merely to rely on a

12  warranty -- reps and warranty and indemnification

13  provision as a form of license when they were doing

14  the reproductions.  I don't need to have anything

15  more than the companies that I generally am aware

16  of, who are music service providers, to know that

17  Apple was being reckless and turning a blind eye to

18  the rights of the underlying musical works -- the

19  owners of those musical works.

20          In my report, I have -- I -- I took a look

21  at a number of notice and takedowns that the -- some

22  of the major record companies were sending to Apple

23  regarding the very recordings at issue in this case,

24  and then Apple would, you know, find a way to allow

25  these recordings to reappear on their system.

Page 232

```
1            So, clearly, I don't need to know more
2      than what eMusic did, what Apple did in my
3      recollection of the procedures that I learned about
4      in the course of writing my book and in the course
5      of running RoyaltyShare in order to make that
6      determination that I think that there was a lot of
7      willful blindness here to the rights of the owners
8      of the copyrights.
9            MR. EDELMAN:  I move to strike everything
10     except the first sentence of the answer.
11            THE WITNESS:  You can't -- no, no, no.
12     I'm not going to accept that because everything in
13     the first sentence is part of the context and part
14     of the answer I provided for the rest.  I will not
15     accept that.  Okay?  My answer is the entire answer.
16     It's not just one piece of the answer, the piece
17     that you might want to select.  Okay?
18            MR. EDELMAN:  So that's fine.  I'm not
19     asking you to accept it.  The judge --
20            THE WITNESS:  That -- that -- that is a
21     slap in my face that you're saying that I'm going to
22     accept one sentence of yours, but I'm not going to
23     accept the next three sentences, but I like the
24     fourth sentence.  That's not going to happen.  Okay?
25            MR. EDELMAN:  It's not up to me.  It's not
```

                                              Page 233

1    up to me.

2              MR. SCHWARTZ:  Mr. Kohn, there's no

3    need --

4              MR. EDELMAN:  The judge will decide.

5              MR. SCHWARTZ:  Yeah, the judge will never

6    decide because you'll never make a motion because

7    there's no such thing as a motion to strike.  Please

8    ask your next question.

9    BY MR. EDELMAN:

10        Q    All right.  So you said companies that you

11   were generally aware of.  That was embedded

12   somewhere in your answer.

13             So are there any particular companies that

14   fall in this category of companies that you are

15   generally aware of, other than eMusic, to which you

16   have compared Apple's practices that you find to be

17   grossly inadequate and reckless?  Can you name any

18   specific companies for me?

19        A    Yeah, I can name one.  Spotify.

20        Q    All right.  Is your -- was your testimony

21   about -- is your -- is your naming of Spotify with

22   respect to Spotify's practices concerning digital

23   downloads?  Because I thought I understood you

24   previously to say that your work on Spotify

25   concerned streaming.

1      A     Well, the -- the -- the process of

2   procuring mechanical licenses for streaming and for

3   digital downloads are -- particularly before the new

4   act, was not far apart at all.  It would be the same

5   process -- if eMusic were a streaming service, you

6   would have had to go through the same machinations.

7   We would have had to do the same things I identified

8   in my report in order to obtain the streaming --

9   interactive streaming licenses that we needed from

10   the suppliers of those sound record- -- from the

11   musical works that underlie those sound recordings.

12            There's no material difference between

13   what would need to be done, one or the other.  You

14   either get compulsory licenses using notices of

15   intent, which Apple could have done, which it chose

16   not to do, and it could have gotten voluntary

17   licenses directly from the source to be assured that

18   it did not violate the copyrights of the underlying

19   musical works.

20            So I don't see any material difference

21   between the -- the -- I don't want to characterize

22   anything that I might have said in another

23   litigation, but there's -- there's -- I don't see

24   any material difference in the lack of diligence and

25   willful blindness that I found in other companies

Page 235

1   similar to what I'm seeing at Apple.

2              As a matter of fact, I've -- from what

3   I've read here in the complaint and what I'm -- had

4   here in the report, I don't even think if -- if

5   Spotify -- I mean, I don't know of any instance in

6   the Spotify situation where they got a notice -- a

7   takedown from a record company where they didn't

8   immediately take it down and -- and -- and do an

9   investigation to make sure what they're getting is

10  legitimate sound recordings.  I think this situation

11  might be worse.

12       Q    You understand that streaming is not at

13  issue in this case, right?

14       A    But do you understand that streaming --

15  interactive streaming requires what's called a

16  "mechanical reproduction license"?

17       Q    My question to you, Mr. Kohn, is --

18       A    Well, my answer to you is that both

19  require mechanical reproduction licenses, and the

20  procedures for getting both are nearly identical.

21  You can send out NOIs for a DDP.  You can send out

22  NOIs for interactive streaming license, or you can

23  do both.  There's no difference under the old act

24  prior to 2018.  Okay?  So there's no material

25  difference between the two.

Page 236

1      Q    You do understand that Apple's practices

2   with respect to streaming are not being challenged

3   in this litigation, don't you?

4      A    I understand that.  Yes, I do.  But what

5   you're trying --

6      Q    Okay.

7      A    -- to do is saying that the stream

8   would -- the -- the -- the lack of diligence that a

9   streaming service did has nothing to do with the

10   lack of due diligence that a digital download

11   service does, and I'm going, no, the procedures are

12   primarily the same.  You --

13      Q    Do you have any --

14      A    -- can get -- you had available -- both

15   companies had available -- they could have done

16   legitimate NOIs for any track on a -- on a recording

17   that it was -- here you have a situation where

18   you're getting recordings from companies you didn't

19   know who -- even what they're -- who they were of

20   recordings that were suspect on their face.  All

21   right?

22          And if you had -- if Apple had any doubt

23   whatsoever -- okay? -- it might have tried to get

24   NOIs, but, frankly, since those recordings were --

25   were not made with the authority of the underlying

Page 247

1       Q     You -- you don't identify the -- the

2   Blagman complaint as something that you --

3       A     No.

4       Q     -- reviewed in forming the opinions in the

5   expert report?

6       A     Okay.  But this is --

7       Q     Are you saying --

8       A     I -- you know what?  I -- I do -- when

9   I -- I do know that case, and I -- I -- I'm sure I

10  have a copy of -- whether there's an opinion on it

11  or whatever, I know it's part of my Kohn on

12  Licensing files.  I know that name.  I was -- I

13  don't know why that's such a familiar case to me and

14  why I brought it up.

15            I had discussed this -- I don't want to

16  say what I discussed with counsel, but it came up in

17  a -- in a -- in a discussion.

18      Q     Did you or did you not review the Blagman

19  complaint in the preparation of this report?

20      A     Yeah, I don't know whether it was the

21  complaint or not.  Let me just -- I can just check

22  my file here.  Hold on.  I know I have it.  That's

23  not working.

24            No, I can't find what I had.  I just can't

25  find it.  Ah, now I know.  Blagman sued eMusic too.

Page 248

1          Q     I'm sorry.  Say that again?

2          A     I think eMusic and The Orchard and Apple

3     and Amazon -- I guess it was one of these cases

4     where -- that's why I remember this case.  2014.

5          Q     What are you looking at right now, sir?

6          A     I just looked up on the Internet where I

7     got -- I'm looking at a memorandum.  I'm looking at

8     a memorandum and order of May 19th, 2014.

9          Q     Okay.  I -- let me be clear:  I'm not

10    asking you to go on the Internet right now and look

11    things up.

12         A     Okay.

13         Q     Okay?  I'm asking you:  What,

14    specifically, did you review, if anything, about the

15    Blagman case --

16         A     Yeah.

17         Q     -- in connection with your expert report?

18         A     I knew about the Blagman case because it

19    came up because of eMusic, and I was, obviously,

20    interested in that when that happened, but it was --

21    I don't want to disclose -- I was warned earlier not

22    to disclose discussions with counsel, but counsel in

23    the case brought up and gave me my understanding

24    that I put in that report of -- let me just find it.

25                Pickwick was a bootlegger.  Okay?  I was

1    informed that -- I knew of the Blagman case.  He

2    told me about the Blag- -- I didn't even look up the

3    case until just now, and I just got the recollection

4    that now I know -- I knew the Blagman case, but I

5    didn't know why.  Now I know why.

6        Q    So your -- your -- your -- your statement

7    that -- on page 36 of your report that "Adasam and

8    Pickwick were specifically identified as bootleggers

9    in a 2012 class action against Apple... and yet

10   Apple never terminated them as providers" is based

11   on your discussion with counsel?

12       A    Yes.

13       Q    Okay.  You are aware that Apple has

14   terminated Adasam and Pickwick as providers,

15   correct?

16       A    I think that was after the lawsuit was

17   filed -- after this suit was filed.

18       Q    You're aware of that, though?

19       A    Yeah.

20       Q    All right.  And -- and on page 36, you

21   state that "Some of the takedown notices evince

22   egregious conduct on the part of Apple," and you go

23   on to discuss one takedown notice from the RIAA.

24            Do you see that?

25       A    Including the cast album for

Page 250

1   West Side Story, hundreds of recordings by artists,

2   like Harry Belafonte, Johnny Mathis.  This one --

3   this includes tracks delivered to Apple by all three

4   of the relevant providers, including 315 tracks by

5   Pickwick; 98 tracks by Adasam; Genepool, 51 tracks.

6   "Apple continued to allow these providers to sell

7   content on iTunes for years after this notice - and

8   continued to enter" into "new contracts with them -

9   even after this notice."

10       Q    Right.

11       A    So I was informed by this.  Okay?  I was

12   informed of this, and the fact that -- and what

13   tells me that there's something wrong with the

14   procedure that Apple -- or the procedure that -- or

15   the nonprocedure that Apple has declined to set up

16   is astonishing to me that there was no investigation

17   done when these recordings were -- I mean takedown

18   notices were sent on all these tracks.

19            It immediately would have made each of

20   these companies suspect, and if it was known to

21   Apple in 2012 that Pickwick is a bootleg just tells

22   you that Apple has no systems in place whatsoever to

23   determine bootleg recordings on its -- on its -- on

24   its site, and if you -- and -- and, clearly, the

25   lawyers at Apple must know that you cannot get a

Page 256

1       A     I -- I --

2       Q     -- you can tell me it's just your opinion.

3       A     -- I think -- no.  You asked that question

4    three times now.  I've answered it twice.

5       Q     But I haven't heard --

6       A     I've answered it twice.

7       Q     I haven't heard any industry sources --

8       A     You haven't heard the answer you want to

9    hear.

10      Q     No, no.

11      A     And that --

12      Q     I don't -- I don't care what the answer

13   is.  I just want to get an answer --

14      A     And that's what counts.  My answer counts,

15   not what you think my answer should be.

16      Q     So I've heard your opinion on the issue.

17            What I'm asking you, Mr. Kohn, is:  Are

18   there any industry sources, besides your opinion,

19   that you can point me to that stand for the

20   proposition that it is industry standard to

21   terminate a distributor after a single takedown

22   notice?

23      A     It's called a Copyright Act.  That's an

24   industry source; how is that?

25      Q     Okay.  So what section of the Copyright

Page 257

1    Act are you talking about?

2         A    I'm talking about section 501, 502 on

3    infringement.

4              I'm suggesting to you that when you know

5    that, in a situation where you are getting a

6    takedown notice for 400 tracks from the antipiracy

7    division of the RIAA from a particular supplier who

8    is a known pirate -- that you knew it was a pirate

9    because you were a defendant in a lawsuit -- that

10   that would be the basis and the source of anyone

11   taking down all of the recordings from that

12   supplier.

13             This is not Universal Music -- this is not

14   Universal Music making one mistake in failing to

15   have a mechanical license or -- or having a

16   licensing to you or recording that was owned by

17   Warner Music.  You don't take down all of

18   Universal's, and then there's a lot of gradations in

19   between.

20             This is not a -- this is not a ambiguous

21   case.  This is very clearcut.  The sources are

22   obvious, and the sources of the copyright law -- and

23   I can point to moral sources beyond, you know, human

24   law and positive law that would suggest that Apple

25   would have to take down all of the recordings of a

Page 258

1    particular supplier under the egregious

2    circumstances in that example.

3        Q    Which sections of 501 or 502 of the

4    Copyright Act govern termination notices that you're

5    referring to?

6        A    Those are the sections upon the source

7    that you asked me for, and I think 501 are part of

8    the infringement provisions.  I'm hoping I'm getting

9    that right.  Maybe I am doing it too late in the

10   day.  But if you are infringing, you will stop the

11   infringement, or else you're going to be enjoined by

12   a court and suffer the consequences.

13       Q    Do any parts of 501 or 502 cover

14   termination notices?

15       A    Implicitly, yes -- okay? -- they do.

16   Implicitly -- implicitly you do not reproduce sound

17   recordings and musical works for which you do not

18   have a license.  Otherwise, you will be guilty of

19   infringement.  And if you do not take measures to

20   even -- if you look the other way on these, it's

21   clear that you're being willfully blind.  There's no

22   question about that.

23       Q    Do sections 501 --

24       A    Is it section -- you know, it's getting

25   late in the day.

Page 265

```
 1    recordings at issue in this case.  They're all
 2    musical works, right?
 3         Q    Okay.  Right.  So rephrase -- let me
 4    rephrase the question.
 5              Do you know whether any of the takedown
 6    notices that Apple received for content provided by
 7    Genepool, Adasam, or Pickwick concerned musical
 8    works at issue in this case?
 9         A    Yes.  I mean, I -- the ones that I've seen
10    are for songs like Stormy Weather and, you know,
11    Come Rain or Come Shine or -- or songs written by
12    Harold Arlen or Johnny -- is it Johnny Mercer in
13    this one?  No.  Is it Irving Caesar?  Harry Warren.
14         Q    If you turn to page 37 of your report,
15    please.
16         A    I'm here.
17         Q    You say -- let me see.  I want to make
18    sure I'm on the right page.  Okay.  Yeah, page 37,
19    the last sentence in the first full paragraph, you
20    say:  "Apple was advised of a widespread problem of
21    Adasam, Pickwick and Genepool/Ideal pirating
22    pre-1972 recordings ..."
23              Do you see that?
24         A    Yeah, now I do.  Let me read that again.
25         Q    I'll read it out loud for the record.
```

Page 266

1                "Apple was advised of the widespread
2       problem of Adasam, Pickwick, and Genepool/Ideal
3       pirating pre-1972 recordings but its reaction showed
4       a willful blindness to the infringements and
5       reckless disregard for Plaintiff's copyrights."
6            A     Okay.
7            Q     Do you see that?
8            A     Yeah.
9            Q     So with respect to all three of them, what
10      evidence supports that statement?
11           A     Well, there's two parts to the statement.
12                One was Apple was advised of a widespread
13      problem of those three defendants pirating pre-1972
14      recordings.  Okay?
15                I think what I stated earlier and what
16      I've learned from our counsel is that Adasam,
17      Pickwick, and Genepool were mentioned as pirated
18      companies -- pirating companies in that -- the
19      Blagman case from time to time, and the takedown
20      notices that I've read show pre-'72 recordings of
21      people like Harry Belafonte and -- who are the
22      others? -- Johnny Mathis and Miles Davis.  So I
23      think it's pretty clear that Apple was advised of a
24      widespread problem for those three companies based
25      upon the documents that I just mentioned and what I

Page 267

1    just mentioned.

2            And the reaction is quite startling

3    because even if they took down some of those

4    recordings, that there was no takedown of the entire

5    works while an investigation is take -- in place --

6    while an investigation -- at least, there should

7    have been an investigation to determine whether they

8    actually had the rights to license the sound

9    recordings, and even if they did, whether they had

10   the right for the mechanical licenses and the import

11   licenses to do what they did in sending this stuff

12   to Apple.

13       Q    The paragraph in your -- paragraph 36 in

14   your report --

15            MR. SCHWARTZ:   Page 36?

16   BY MR. EDELMAN:

17       Q    I'm sorry.  Page 37, the paragraph we've

18   been discussing in your report refers to -- you

19   are -- you're referring to the Blagman complaint --

20   you're quoting from the Blagman complaint, correct?

21       A    I wasn't -- I wasn't quoting it, but I --

22   it was my understanding that they were identified as

23   bootleggers in that com- -- not complaint, but in

24   that case.  I don't know why I used the word

25   "complaint," but that's what I see when I see

                                                    Page 270

1   send an album that's owned by Warners inadvertently,

2   and that happens.  All kinds of metadata problems

3   occur.

4        Q    I want to ask you a few questions about

5   your rebuttal port -- report, which we have marked

6   as Exhibit 5.

7        A    Okay.  I have that in front of me on my

8   screen -- on my iPad screen.

9             (Exhibit 5 was marked for

10            identification.)

11  BY MR. EDELMAN:

12       Q    Okay.  First, did you draft this?

13       A    Yes.

14       Q    Did -- did anybody else draft any portions

15  of it?

16       A    No.

17       Q    Did you change any words in this report

18  after consultation with your counsel?

19       A    I might have, but I don't remember

20  anything specific.

21       Q    At the end of the first paragraph in

22  section 1, you say that "Had Apple performed even a

23  minimal amount of due diligence, it would have

24  recognized that the recordings were owned, or had

25  already been supplied, by Universal Music and other

Page 271

1   legitimate record companies."

2           Do you see that?

3       A   Yes.

4       Q   So are you saying that if Universal Music

5   had already supplied a sound recording to Apple, no

6   other label or distributor could legitimately supply

7   the same sound recording?

8       A   It would be in a very extreme, unusual

9   circumstance where another company would provide the

10  same sound recording.

11      Q   One example might be for a greatest

12  hits --

13      A   It might be.

14      Q   -- album?

15      A   It might be for better -- more likely --

16  usually greatest hits is produced by the same record

17  company.  Like, if it's Ella Fitzgerald on Universal

18  Records and Ella Fitzgerald, The Greatest Hits, it's

19  likely to be produced by Universal Records under

20  their own -- under their own license.

21          More likely is that, in rare

22  circumstances, people who do movie soundtracks will

23  license individual recordings from various record

24  companies to -- to make -- get synchronization

25  licenses for use of those tracks in the movies and

Page 272

1   the producer of the movie would like to put out a

2   soundtrack album.   In the old days, it would be

3   vinyl or compact disk.

4            But in the digital era, the practice

5   and -- the custom and practice would be the record

6   company, like Universal, would license an individual

7   track for use in a sound recording, but the practice

8   was that the sound recording -- I know that Apple

9   did this for many years, but you had to buy the

10  entire soundtrack album.   You couldn't just buy

11  single tracks because that would compete against the

12  Ella Fitzgerald track on the album that Universal

13  would be offering through Apple.

14           So it's possible, but not likely.

15           You're mute -- you're muted.

16      Q    Sorry.   I muted because my dogs were

17  barking.

18           What would be other examples of where a

19  record label would have supplied a sound recording

20  to Apple but a different label or distributor could

21  legitimately supply the same sound recording?

22      A    Well, the only thing I can think of,

23  really, is a soundtrack album where that would

24  occur.

25      Q    Are there other --

Page 292

1   question on it.

2              Second, they wouldn't even be doing

3   business with smaller suppliers like that because

4   they're -- these are very complex distribution

5   relationships that they're going to have.

6              Now, there is no custom and practice

7   when -- now, if Best Buy were to do a deal with

8   Pickwick and distributed their pirated CDs, yes,

9   Best Buy would be infringing the distribution right

10  of the copyrighter, but in the physical area, which

11  is the problem -- which is the -- the -- the -- the

12  connection that Steve was trying to make -- and

13  falsely trying to make -- is that Best Buy only does

14  the distribution.  They're receiving pallets of CDs

15  and then distributing it to third parties.  They're

16  not doing the reproduction.

17             The history of copyright in the mechanical

18  area -- the history of reproducing musical works in

19  mechanical reproductions has always been the person

20  or the entity doing the reproducing and

21  distribution, not just the distribution that has the

22  custom and practice of procuring mechanical

23  licenses.  That puts Apple in a completely different

24  position than Best Buy.  Best Buy would only get

25  their CDs supplied from major people because of the

Page 293

```
 1   terms and conditions that were part of those deals
 2   that I mentioned earlier, like returns and credit
 3   policies, et cetera, and -- but iTunes is in a
 4   totally different position.  They're doing the
 5   reproducing.  They're the ones that need to assure
 6   that they have a mechanical license in order to
 7   distribute sound recordings that contain those
 8   musical works.
 9           The problem that we have here is that not
10   only did Apple not take its responsibility
11   seriously -- all right? as Best Buy would take it
12   seriously by not buying from Pickwick those CDs --
13   Apple simply put up a portal and allowed the
14   Pickwicks and Adasams of the world to put their
15   information up:  We're from the U.K.  Here's a bunch
16   of Frank Sinatra, Ella Fitzgerald recordings, and
17   Apple took it.  No human intervention.  They put
18   that on their system, and they infringed the
19   copyrights.  That is willful blindness, and your
20   expert witness testified to -- Steve Marks testified
21   that Apple relied -- instead of relying on a
22   license, they relied on a representation and
23   warranty and indemnification.  A rep and warranty
24   and indemnification is not a license.  It means that
25   Apple -- since they did the reproduction and
```

Page 294

1    distribution and since reproducers and

2    distributors -- reproduction companies are the ones

3    responsible for getting the mechanical license.  By

4    not getting it, Apple infringed the copyright.  All

5    right?  And the reason why they infringed the

6    copyright is they don't have any systems in place to

7    make sure they had the licenses necessary.

8              So the -- the -- Mr. Marks's trying to

9    equate the Best Buy physical business model with the

10   digital model is completely off base and irrelevant.

11   As a matter of fact, I think by suggesting that

12   Apple sat back and said, oh, we'll just rely on our

13   warranties and representation, is clear evidence of

14   willful blindness.

15             You take a look at what Apple did to do

16   nothing to protect itself and to protect the

17   songwriters and protect the music publishers from

18   companies like Pickwick and look the -- the other

19   way, that was a business decision that Apple made in

20   2003.  Apple knew very well what eMusic was doing.

21   All the things that I mentioned.  We may have been

22   one of the only ones, and if you're -- you're --

23   you're -- you're going to great lengths to point

24   out:  Well, it was only eMusic.  Well, it was only

25   eMusic really doing digital download really in a

Page 295

1   serious way, in a legitimate way at that time.

2            Apple saw what we were doing, and Apple

3   made a business decision:  We're going to take a lot

4   more risk when it comes to the underlying musical

5   works.  We're going to license all of those sound

6   recordings, but we'll worry about the long tail of

7   those underlying musical works, mechanical licensing

8   because it's too difficult.  You know, it's going to

9   take too long.

10            And look what they did.  They succeeded.

11   Apple succeeded in getting first-to-market advantage

12   with major record label stuff in 2003, in a very

13   short period of time, and within ten years, their

14   iTunes business, in 2010, was as big as their entire

15   company was in 2003 when they started the iTunes

16   business.  So they built their company on the backs

17   of songwriters.  They paid the major record labels,

18   because the major record labels are going to sue

19   them, but individual songwriters and widows and

20   grandchildren of Harry Warren and Harold Arlen

21   weren't there to file lawsuits against Apple for

22   doing these things.

23            So if Apple decided that they'll pay the

24   piper later, in 2003, this is where they have to pay

25   the piper.  That's what happened.  This is what's

Page 304

1        I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4        That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing is a true

11   record of the testimony given.

12        Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ X ] was [  ] was not requested.

16         I further certify that I am neither

17   financially interested in the action nor a relative

18   or employee of any attorney or any party to this

19   action.

20        IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated:   11/19/202

23                         *Catherine A. Ryan*

                         Catherine A. Ryan, RMR, CRR

24                         CSR No. 8239

25