SCOTT A. EDELMAN, (SBN 116927)
  sedelman@gibsondunn.com
ILISSA SAMPLIN, (SBN 314018)
  isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Suite 4000
Los Angeles, CA  90067-3026
Telephone: 310.552.8500
Facsimile:  310.551.8741

GABRIELLE LEVIN (*pro hac vice*)
  glevin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone: 212.351.4000
Facsimile:  212.351.4035

Attorneys for APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SA MUSIC, LLC, et al.,<br><br>                    Plaintiffs,<br><br>     v.<br><br>APPLE INC., et al.,<br><br>                    Defendants. | CASE NO. 3:20-cv-02146-WHO<br>CASE NO. 3:20-cv-02794-WHO<br>CASE NO. 3:20-cv-02965-WHO<br><br>**DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE EXPERT REPORT OF TY ROBERTS**<br><br>**Hearing:**<br>Date: January 26, 2022<br>Time: 2:00 p.m.<br>Judge: Hon. William H. Orrick |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 2

A. The Court May Consider Only Admissible Evidence ..... 2

B. Roberts's Opinions Are Inadmissible Because There Is An Insufficient Connection Between His Expertise And His Conclusions ..... 2

1. Roberts's Opinion About The Accuracy Of The Audible Magic Reports Submitted In These Cases Is Inadmissible ..... 3

2. Roberts's Lack Of Qualification Should Not Be Excused By Audible Magic's Use In Other Cases, Particularly Given The Errors In The Reports At Issue Here ..... 7

3. Roberts Is Not Qualified To Opine About What Apple "Should" Have Done to Prevent Copyright Infringement ..... 11

III. CONCLUSION ..... 13

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Arista Records LLC v. Lime Wire LLC*,
  2010 WL 10031251 (S.D.N.Y. Aug. 9, 2010) ................................................................... 7, 8

*Arista Records LLC v. Myxer Inc.*,
  2011 WL 11660773 (C.D. Cal. Apr. 1, 2011) ........................................................................ 7

*Daubert v. Merrell Dow Pharmaceuticals Inc.*,
  509 U.S. 579 (1993) ............................................................................................................... 2

*Fosmire v. Progressive Max Ins. Co.*,
  277 F.R.D. 625 (W.D. Wash. 2011) ....................................................................................... 8

*Hangarter v. Provident Life & Acc. Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004) ................................................................................................ 13

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................................... 9

*Nationwide Transp. Fin. v. Cass Info Sys., Inc.*,
  523 F.3d 1051 (9th Cir. 2008) .............................................................................................. 13

*Orr v. Bank of Am., NT & SA*,
  285 F.3d 764 (9th Cir. 2002) .................................................................................................. 2

*Estate of Pilgrim v. Gen. Motors* LLC,
  2021 WL 5917584 (9th Cir. Dec. 15, 2021) .......................................................................... 2

*Sound View Innovations, LLC v. Hulu, LLC*,
  2019 WL 4640393 (C.D. Cal. Aug. 5, 2019) ....................................................................... 13

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  718 F.3d 1006 (9th Cir. 2013) ................................................................................................ 7

*UMG Recordings v. Veoh Networks, Inc.*,
  665 F. Supp. 2d 1099 (C.D. Cal. 2009) .................................................................................. 7

*UMG Records, Inc. v. Escape Media Group, Inc.*,
  2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014) ....................................................................... 8

*United States v. Hermanek*,
  289 F.3d 1076 (9th Cir. 2002) ........................................................................................... 3, 9

*United States v. Valencia-Lopez*,
  971 F.3d 891 (9th Cir. 2020) ........................................................................... 2, 3, 6, 7, 10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*WBIP, LLC v. Kohler Co.*,
  829 F.3d 1317 (Fed. Cir. 2016)................................................................................................13

**RULES**

Fed. R. Civ. P. 56(c)(4) ....................................................................................................................2

Fed. R. Evid. 702 .........................................................................................................................2, 6

# I. INTRODUCTION

Seeking to rescue Ty Roberts's expert report from its obvious deficiencies, Plaintiffs attempt to revise the report through their opposition brief—arguing that the purpose of the report was not to verify the accuracy of Audible Magic's work, but rather to "analyze" and "explain" the Audible Magic reports attached to Roberts's report. Dkt. 142[1] (Pls.' Opp'n) 7. That assertion is belied by both the text of the report and Roberts's sworn testimony—which make clear that Roberts opines about whether the Audible Magic reports "are reliable and accurate." Dkt. 115-1 (Roberts Rep.) at 11. Roberts did not assess whether Audible Magic used the "appropriate procedures"; he simply regurgitated what he was told about the process of creating the reports by Plaintiffs' attorneys. And Roberts articulates no reasonable basis for his opinion about the reports' accuracy and reliability other than his general knowledge of fingerprinting systems—which he made no effort to link to his conclusion that these specific reports are reliable and accurate.

These failures are particularly egregious given that the Audible Magic reports contain multiple apparent errors that Roberts failed to investigate. Plaintiffs now admit that at least one of the errors is a "false positive," or a situation in which an automatic content recognition ("ACR") system "identified the wrong recording in the reference database." Pls.' Opp'n 12–13; Roberts Rep. at 4. This highlights the unreliability of Roberts's report, as Roberts asserted unequivocally that "Audible Magic's Rx service is extremely accurate with no false positives with respect to matches." Roberts Rep. at 9.

That Audible Magic reports have been used in other cases does not excuse Plaintiffs' failure to proffer a qualified expert who actually analyzed the reports at issue and investigated any apparent discrepancies. The Court has a gatekeeping responsibility with regard to expert testimony in these cases. Roberts is not qualified to opine about the accuracy or reliability of the Audible Magic reports at issue, particularly given that they contain multiple errors that neither he nor Plaintiffs have been able to explain.

With respect to Roberts's separate opinion about what Apple "should have" done to prevent copyright infringement in the iTunes Store, Plaintiffs fail to address Apple's central argument about

---

[1] All docket cites are to the *Adasam* case, No. 20-cv-2146.

Roberts's lack of qualification to offer such an opinion. Specifically, Plaintiffs do not address that Roberts's experience at Gracenote, a "metadata and media recognition provider," Roberts Rep. at 1, does not qualify him to opine about what a digital music retailer should have done to prevent copyright infringement. Instead, Plaintiffs mischaracterize the record in these cases and insist that Roberts should be able to testify about "what other companies do," Pls.' Opp'n 15, even though Roberts himself has admitted that he does not know what other digital retailers do to combat copyright infringement.

Because Plaintiffs do not connect Roberts's experience to any of the opinions he seeks to offer in these cases, his opinions are not based on a reliable foundation. They are therefore inadmissible and should not be considered on summary judgment or at trial.

## II. ARGUMENT

### A. The Court May Consider Only Admissible Evidence

Citing out-of-circuit authority, Plaintiffs argue that the Court may consider Roberts's expert report on summary judgment, even if it is likely to be deemed inadmissible at trial, "as long as a colorable argument exists that Roberts' report is helpful to the Court in deciding whether there are any genuine issues of material fact." Pls.' Opp'n 5–6. Plaintiffs are mistaken. In the Ninth Circuit, "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(c)(4). Thus, if an expert report is inadmissible, it may not be considered at the summary judgment stage. *Estate of Pilgrim v. Gen. Motors LLC*, 2021 WL 5917584, at *1 (9th Cir. Dec. 15, 2021) (affirming grant of summary judgment for defendants in products liability case because plaintiffs' only evidence of a defect was inadmissible expert declarations).

If an expert's testimony is unreliable, it is inadmissible. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993). For the reasons explained in Apple's opening brief and below, Roberts's report is unreliable. It is therefore inadmissible and may not be considered by the Court in connection with Plaintiffs' motion for summary judgment.

### B. Roberts's Opinions Are Inadmissible Because There Is An Insufficient Connection Between His Expertise And His Conclusions

The proponent of expert testimony has the burden of "establish[ing] the reliability of the

principles and methods employed 'to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant.*'" *United States v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020) (quoting *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002)). Although an expert's conclusions can be based on experience, "qualifications and experience" cannot, by themselves, "establish the reliability and thus the admissibility of the expert testimony at issue." *Id.* An expert must "link his general expertise with" his specific conclusions and must "provide[] a reliable basis for his opinion[s]." *Id* at 900–01. Roberts has not done so here.

Apple does not dispute that Roberts may be an appropriate expert in the field of ACR systems generally. But the opinions Roberts offers in these cases are not about ACR systems generally. Roberts's opinions in these cases are about the accuracy of four specific Audible Magic reports and how Apple "should have" used ACR technology in the iTunes Store. Specifically, Roberts opines that "the May 28, June 28, and August 27 Audible Magic Rights Rx Reports (Exhibits 1-3) are reliable and accurate analyses of matches resulting from the comparison between the recordings produced by Apple and the recordings in the Audible Magic database," that "the August 27 Private Database Report (Exhibit 4) is a reliable and accurate analysis of matches resulting from the comparison between the Pirated Recordings and Original Release Recordings," and that "[i]dentifying matches by comparison of material uploaded for sale on iTunes should have been the first step in a process of review [by Apple] to determine whether the delivering party actually had rights in the content." Roberts Rep. at 11.

Plaintiffs have failed to "link" Roberts's general expertise in the field of ACR systems with the specific opinions he has proffered in these cases, and Roberts has failed to provide a reliable basis for the opinions. His testimony is thus unreliable and inadmissible.

1. **Roberts's Opinion About The Accuracy Of The Audible Magic Reports Submitted In These Cases Is Inadmissible**

Roberts's opinion about the accuracy of the Audible Magic reports submitted in these cases is inadmissible because he is not qualified to opine on the topic—and his lack of qualification should not be excused by Audible Magic's purported general reliability, particularly given the glaring errors in the Audible Magic reports at issue that neither he nor Plaintiffs can explain.

### a. Roberts Is Not Qualified To Opine On The Accuracy Of The Audible Magic Reports

As discussed in Apple's opening brief, Roberts does not have any specialized knowledge regarding how Audible Magic works. Roberts's expertise in ACR technology comes from his time at a different company, Gracenote. And he was not involved in creating the Audible Magic reports Plaintiffs submitted in these cases. Plaintiffs insist these facts are not disqualifying because, "[c]ontrary to Apple's claim, Roberts' role was not to validate the accuracy of the Audible Magic technology," but "to analyze and explain the results of the Audible Magic reports, and determine whether they appropriately applied their technology to the audio identification task." Pls.' Opp'n 7; *see also id.* at 9 (making similar assertions). But it is not "Apple's claim" that Roberts's role was to validate Audible Magic's accuracy; Roberts himself testified that his "job was to validate the fingerprinting" performed by Audible Magic. Dkt. 111-18 Ex. 70 (Roberts Dep.) at 249:23–24; *see also id.* 129: 4–7 ("My report is about accuracy of fingerprinting . . . ."). And Apple's argument is not merely that Roberts does not know how Audible Magic's proprietary technology works (although it is clear he does not). Mot. at 4–6. Apple's argument is that Roberts did not in fact "analyze" the Audible Magic reports or determine whether Audible Magic "appropriately applied [its] technology" to the task at hand. *See id.* at 6–8.

In an effort to shore up Roberts's report in response to Apple's *actual* arguments, Plaintiffs mischaracterize Roberts's report, asserting that Roberts took steps "to determine whether Audible Magic performed the necessary analyses," Pls.' Opp'n 3, assessed "whether the tests run and datasets compared were the appropriate procedures that would accurately find matches between the pirated recordings and the originals," *id.* at 7, and "carefully considered which aspects of the sound recordings were compared, and how," *id.* Plaintiffs also assert that when Roberts "needed clarity on the procedures followed, he asked Audible Magic." *Id.* at 8.

Each of these assertions is belied by the actual text of Roberts's report and his sworn deposition testimony. Roberts's report contains a description of the contents of the Audible Magic reports, but there is no indication that Roberts "determine[d]" whether Audible Magic "performed the necessary analyses" or used "appropriate procedures," as Plaintiffs now baldly assert. Roberts does not describe in his report the criteria for determining whether an audio fingerprinting analysis is reliable or explain

whether and how the Audible Magic reports meet those criteria. Nor is there any indication in Roberts's report that he assessed whether Audible Magic's process was correct, or whether a different process would have been more reliable. And while Roberts testified that an Audible Magic employee explained to him the "format of the data . . . in the [Audible Magic reports]" at issue, including the "fields" in the spreadsheets that comprised the reports, that was a conversation about the reports' "terminology." Roberts Dep. at 16:4–17:6, 19:9–13. There is no record that Roberts asked a single question about the "procedures" Audible Magic followed in creating the reports.

Similarly, Plaintiffs assert that Roberts "confirmed that Audible Magic identified when certain recordings had been slowed down" and "corrected for that manipulation." Pls.' Opp'n 8. But Roberts did no such thing. He read in the Audible Magic report that Audible Magic had "found that some music had been slowed down to a point where it could not be identified with normal processing." Roberts Rep. Ex. 1 ("Processing Summary" tab). But at his deposition, Roberts confirmed that he had not listened to any of the purportedly slowed-down tracks to determine whether they had actually been slowed down. Roberts Dep. at 187:17–188:1. Roberts was not involved in the effort to speed up certain tracks and re-run them through Audible Magic's database. He testified that "counsel told me" that certain files had been sped up to see if there was a match, but he could not say who did the work of speeding up the files or identify which files had been sped up. *Id.* at 228:22–229:3, 233:5–12.

So Roberts did not "confirm[]" that certain recordings had been slowed down; he simply repeated what he read in the Audible Magic report to that effect. Nor did he "correct[]" for that "manipulation," as Plaintiffs now claim. If Plaintiffs are referring to the fact that certain tracks were sped up and re-run through Audible Magic's database, the record is clear that *Plaintiffs' counsel* was responsible for that effort, not Roberts. *Id.* at 228:22–229:3; Dkt. 118. And in his report itself, Roberts simply notes that in the June 28, 2021 Audible Magic report, 43 audio files "were replacement files for recordings that had been slowed down," then goes on to speculate that "[t]he number of matched recordings would be higher . . . to the extent the speed of the Pirated Recordings was slowed down 3-5%." Roberts Rep. at 8, 10. In other words, Roberts believes the number of matched recordings would be higher if someone *had* corrected for this purported manipulation—but he did not. *See id.*

Attempting to avoid the implications of Roberts's inability to opine about Audible Magic's accuracy, Plaintiffs recharacterize the purpose of Roberts's report—asserting that it was intended to "analyze and explain the results of the Audible Magic reports," not to "validate the accuracy of the Audible Magic technology." Pls.' Opp'n 7. But as explained above, Roberts *did not* analyze the Audible Magic reports; he merely described them. And he *did* reach conclusions about the accuracy of the reports, opining that "the May 28, June 28, and August 27 Audible Magic Rights Rx Reports (Exhibits 1-3) are reliable and accurate analyses of matches resulting from the comparison between the recordings produced by Apple and the recordings in the Audible Magic database," and that "the August 27 Private Database Report (Exhibit 4) is a reliable and accurate analysis of matches resulting from the comparison between the Pirated Recordings and Original Release Recordings." Roberts Rep. at 11.

These conclusions are unreliable for two reasons. First, Plaintiffs assert that Roberts was not "validat[ing] the accuracy of the Audible Magic technology." Pls.' Opp'n 7. But the Audible Magic reports were created using Audible Magic technology. If Roberts cannot validate the accuracy of that technology, then he is not qualified to opine about the accuracy of the reports created with that technology.

Second, Roberts failed to provide any reasonable foundation for his conclusion that the Audible Magic reports "are reliable and accurate." He asserts that his conclusions are "[b]ased on my experience and what I know about the Audible Magic recognition technology, fingerprinting system capabilities and the approach used to create this report." Roberts Rep. at 11. But as explained in Apple's opening brief, Roberts's experience is with a different ACR company, Gracenote. Apple Mot. 2, 9–11. Roberts testified at deposition that he does not actually know how "Audible Magic's exact algorithm" works and is "not an expert" in that area. Roberts Dep. at 263:21–22. And he was not involved in creating the reports at issue. Apple Mot. 6–7; Roberts Dep. at 168:7–20, 182:4–13. That leaves only Roberts's general knowledge of "fingerprinting system capabilities," and there is simply no explanation by Roberts of how this general knowledge led him to conclude that the Audible Magic reports "are reliable and accurate."

Rule 702 "requires the district court to assure that the [expert's] methods are adequately explained." *Valencia-Lopez*, 971 F.3d at 900 (citation omitted). Where an expert "never explain[s]

*how* his expertise lent itself to [his] conclusion[s]," the court "cannot sort out what reliable principles and methods underlie the particular conclusions offered," and the expert's testimony cannot be deemed reliable. *Id.* (citation omitted). Because Roberts never explains how his general knowledge about ACR systems led to his conclusion that the Audible Magic reports are reliable and accurate, his opinions based on those reports are inadmissible. *Id.*

### 2. Roberts's Lack Of Qualification Should Not Be Excused By Audible Magic's Use In Other Cases, Particularly Given The Errors In The Reports At Issue Here

Plaintiffs contend that Roberts's lack of qualification to opine about the accuracy of the Audible Magic reports in question should be forgiven because Audible Magic has been used in other copyright cases. Pls.' Opp'n 8, 10–11. That Audible Magic's technology has been described in other cases is not reason to admit unqualified expert testimony here. And even if Audible Magic reports have been admitted in other cases, there are glaring errors in *these* Audible Magic reports that neither Plaintiffs nor Roberts can explain—further demonstrating that Roberts is unqualified to opine about these reports' accuracy or reliability.

#### a. The Cases Plaintiffs Cite Do Not Hold That Audible Magic Is Reliable

Plaintiffs cite other cases in which Audible Magic's technology has been mentioned, the implication being that other courts have found Audible Magic to be trustworthy and reliable. *See* Pls.' Opp'n 8, 10–11. But none of the cases Plaintiffs cite involve a finding of reliability. In *UMG Recordings, Inc. v. Shelter Capital Partners LLC,* the court briefly described the purpose of Audible Magic in its description of background facts, but did not discuss whether Audible Magic was a reliable service, and there is no indication that Audible Magic reports were used as evidence in the case. 718 F.3d 1006, 1012–13 (9th Cir. 2013). Similarly, in *Arista Records LLC v. Myxer Inc.*, the parties disputed whether the defendant's use of Audible Magic provided it with "aware[ness] of facts or circumstances from which infringing activities was apparent" for purposes of the Digital Millennium Copyright Act. 2011 WL 11660773, at *5, *26–27 (C.D. Cal. Apr. 1, 2011). The Court made no reliability findings regarding Audible Magic. *See id.* The same was true in *UMG Recordings v. Veoh Networks, Inc.*—the court described a defendant's use of Audible Magic but did not comment on its reliability. 665 F. Supp. 2d 1099, 1103, 1111–12 (C.D. Cal. 2009). And in *Arista Records LLC v.*

*Lime Wire LLC*, the court simply entered a consent injunction that defined "Fingerprinting Technology" and described Audible Magic as a "commercial[] vendor" supplying fingerprinting technology services, without any discussion or finding of reliability. 2010 WL 10031251, at *1, *6 (S.D.N.Y. Aug. 9, 2010).

The only case Plaintiffs cite where the admissibility of Audible Magic reports was even at issue is *UMG Recording, Inc. v. Escape Media Group, Inc.*, 2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014). There, the defendants argued that the plaintiffs should have disclosed Audible Magic as a third-party expert, not that the plaintiff's expert was unqualified to testify about Audible Magic reports or that the reports contained mistakes. *Id.* at *15–16. The court did not decide whether Audible Magic was an expert, but held that even if it was, the plaintiffs' failure to disclose it as such had not prejudiced the defendants, who had declined to depose the plaintiffs' experts. *Id.* at *17. That fact pattern is not analogous to the present case, where Apple *did* depose the expert testifying about Audible Magic—who testified that he did not investigate apparent mistakes in the Audible Magic reports because he "assume[d]" the "that the fingerprinting was accurate," Roberts Dep. at 242:5–11, and was unable to explain multiple apparent mistakes in the reports, *id.* at 240:18–243:10, 244:22–246:25, 249:14–24.

        **b.**        **The Use Of Audible Magic Reports In Other Cases Is No Guarantee Of The Accuracy Or Reliability Of The Specific Reports At Issue Here**

Plaintiffs assert that because Audible Magic has been referenced in other cases, Roberts's testimony about the specific Audible Magic reports at issue (and, by extension, the reports themselves) is reliable because "it is reasonable for an expert in Roberts' field to rely on the facts and data in Audible's reports in forming his opinions." Pls.' Opp'n 10–11. Although Federal Rules of Evidence 702 and 703 permit experts to rely on "facts or data" that is "of a type reasonably relied upon by experts in the field," they "do not permit an expert to rely upon opinions developed by another expert for purposes of litigation without independent verification of the underlying expert's work." *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 630 (W.D. Wash. 2011) (collecting cases). That is an important distinction that bears precisely on what happened here: an "Audible Magic expert" ran reports related to these litigations at the behest of Plaintiffs' counsel. Roberts Dep. at 15:22–16:11, 168:7–20, 182:4–13. Roberts did not meaningfully verify those reports, as evidenced by, among other

things, his failure to investigate at least four apparent mistakes in the reports. *See infra* Part II.B.2.c; Roberts Dep. at 240:18–243:10, 244:22–246:25, 249:14–24.

That Audible Magic reports have been used in other cases does not indicate that Roberts is qualified to opine about the reliability of the specific Audible Magic reports at issue here.[2] This Court has a gatekeeping function with regard to the expert testimony proffered in *these* cases. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002). Audible Magic's use in other cases is not a guarantee of reliability here, and it has no bearing whatsoever on the question of whether Roberts is qualified to testify about the accuracy of these particular Audible Magic reports. For all the reasons described above, he is not.

### c.  The Reports Contain Multiple Mistakes Neither Roberts Nor Plaintiffs Can Explain

Plaintiffs also argue that Roberts was not required to have any specialized knowledge about Audible Magic's technology to opine about the accuracy and reliability of the Audible Magic reports at issue, because Audible Magic is generally regarded as reliable and there is no evidence that Audible Magic made a mistake here. Pls.' Opp'n 8. They somehow assert that Apple "does not claim that the reports are inaccurate in any way," and that "Apple has had this evidence and never identified a single mistake." *Id.* at 8, 12. In fact, *Apple identified at least four apparent mistakes* in the Audible Magic reports—all instances where a single sound recording produced by Apple was identified as being a "match" for more than one composition. Apple raised these mistakes during Roberts's deposition and in its opening brief filed in support of this motion. Roberts Dep. at 240:18–243:10, 244:22–246:25, 249:14–24; Apple Mot. 7–8.

At his deposition, Roberts did not explain why these mistakes appeared in Audible Magic's reports. He could speculate, but he could not offer any definitive testimony on the subject because he

---

[2] Plaintiffs assert that "Roberts . . . understands that '[t]he ability of the Audible Magic software to identify and match files to copyrighted content has been widely recognized' by courts," implying that Roberts took this into account when coming to his conclusion about the reliability of the specific Audible Magic reports at issue. Pls.' Opp'n 10 (alteration in original). But Plaintiffs' counsel wrote the portion of Roberts's report containing this caselaw, and Roberts testified that he did not read every case cited. Roberts Dep. at 103:2–13, 174:17–176:7. Even if he had read every case, what courts have said about the reliability or accuracy of Audible Magic reports cannot excuse Roberts's lack of qualification to opine on the topic, as discussed *infra*.

had not listened to the recordings to determine why there were discrepancies. Roberts Dep. at 240:18–243:10. Instead, he "assume[d] that the -- that the fingerprinting was accurate" and that any discrepancies in the report were the result of users somehow introducing metadata mistakes into the reference database. *Id.* at 242:5–11. So when it came to a recording that had been identified as both "I've Got the World on a String" by Frank Sinatra and "Hey Now Listen" by the rapper JSapp, Roberts testified that his "guess would be that . . . there is an absolute match on the fingerprinting and the metadata is wrong." *Id.* at 240:10–14. He added that "it's possible that there are two songs in one of the -- in the longer [recording]. There is actually two tracks in that one file." *Id.* at 240:21–241:10.

Plaintiffs assert that "Roberts was completely correct" because "[t]he track *Hey Now Listen* by the rapper JSapp is available on iTunes and the first 30 seconds of the track is a sample of Frank Sinatra's recording of *I've Got the World on a String*." Pls.' Opp'n 13. If that is true, then Roberts was not "completely correct." His first guess, that the songs were identical but "the metadata is wrong," was incorrect. More importantly, if Plaintiffs are correct that "Hey Now Listen" samples "I've Got the World on a String," then the Audible Magic reports contain at least one false positive. Roberts defined a "false positive" as when an ACR system "identified the wrong recording in the reference database." Roberts Rep. at 4. That is apparently what happened here: the sound recording produced at APL-PICK_00000199 is "I've Got the World on a String," but it was identified by Audible Magic as "Hey Now Listen," a false positive. This fatally undermines Roberts's assertion that "Audible Magic's Rx service is extremely accurate with no false positives with respect to matches." *Id.* at 9.

APL-PICK_00000199 is not the only apparent false positive. As explained in Apple's opening brief, at least three other sound recordings were identified as matches for two or more compositions. Apple Mot. 8. Plaintiffs argue that Apple "offers no evidence these are errors by Audible Magic," Pls.' Opp'n 13, but it is *Plaintiffs'* burden to establish the reliability of their expert's report, not Apple's burden to proffer evidence that apparent mistakes in exhibits to an expert report are in fact "errors." *Valencia-Lopez*, 971 F.3d at 900. Moreover, Plaintiffs admit that they themselves "have not been able to locate copies of the[] other audio files" implicated in the discrepancies Apple has identified. Pls.' Opp'n 13 n.6. If Plaintiffs and their ACR expert are unable to determine why the Audible Magic

reports say what they say, they have no reasonable basis for insisting that the reports are accurate and reliable.

Plaintiffs list some reasons Roberts had for "trust[ing] the accuracy of Audible Magic's proprietary technology." *Id.* at 9–10.  But Audible Magic's general reputation, that Roberts worked for an Audible Magic competitor, and that Universal Music used Audible Magic do not support Roberts's conclusion that the Audible Magic reports submitted *in these cases* "are reliable and accurate analyses of matches," Roberts Rep. at 11—especially given that the reports contain obvious discrepancies Roberts failed to investigate.

Plaintiffs analogize Roberts's faith in Audible Magic to a medical expert evaluating a doctor's diagnosis without understanding "the exact internal mechanisms" of a thermometer.  Pls.' Opp'n 11.  But Roberts's report does not review or analyze the work of another expert in his field; it simply describes and vouches for that work.  The more accurate analogy is to a medical expert who writes a report vouching for the accuracy of a particular thermometer, despite not knowing its "exact internal mechanisms," and even though the thermometer produced different, incompatible readings for the same patient.  Then, when asked why there were two different readings, the expert says he does not know for sure and did not investigate because he simply assumed the thermometer was accurate.

Finally, Plaintiffs' assertion that Apple's musicologist, Judith Finell, "did not identify any incorrect matches in the Audible Magic report" tilts at windmills.  *Id.* at 9.  Finell analyzed (and identified mistakes in) the report of Plaintiffs' musicologist, Alexander Stewart, but she had nothing to do with—and did not consider or ever purport to opine about—the Audible Magic reports.  Dkt. 137-1 Ex. 132 at 1–3; Dkt. 111-18 Ex. 77 at 204:16–205:25.  Finell's lack of comment on the Audible Magic reports says nothing about their accuracy or Roberts's qualifications to opine about the same.

### 3. Roberts Is Not Qualified To Opine About What Apple "Should" Have Done to Prevent Copyright Infringement

In its opening brief, Apple explained that Roberts also is unqualified to opine that "Apple . . . could have required their content providers to follow ACR ownership verification procedures," but the iTunes Store "is wide open for piracy."  Roberts Rep. at 12; Apple Mot. 8–9.  In their opposition, Plaintiffs do not address Apple's central argument, which is that Roberts's experience at Gracenote

does not qualify him to opine about what Apple, a digital music retailer, "should" do to prevent infringement in the iTunes Store. Instead of attempting to explain how Roberts's Gracenote experience could possibly support his conclusions about Apple, Plaintiffs list additional items on Roberts's resume, including that he "holds multiple patents in audio recognition, metadata, and multimedia." Pls.' Opp'n 14. Plaintiffs assert that "Roberts should be able to use his undisputed expertise in metadata and audio recognition technology to help the factfinder understand what other companies do," but do not explain how Roberts's technology-related patents qualify him to testify about "what other companies do to" prevent infringement and "what Apple could or should be done [sic]" here. *Id.* at 15.

Plaintiffs do not identify the "other companies" about which they contend Roberts should be permitted to testify. *Id.*[3] And Roberts has already testified that he is "not the expert to know to what level [infringement prevention] tools" are used by "all the many different retailers that are out there," and he is "not in a position" to "testify as to how Audible Magic is primarily used in the industry." Roberts Dep. at 114:2–5, 174:12–16. Roberts has never worked directly on antipiracy or infringement prevention efforts related to digital music retailers, and he does not know whether record labels require digital retailers to use audio fingerprinting. *Id.* at 98:14–18, 123:17–24. Indeed, just one page after asserting that Roberts should be permitted "to help the factfinder understand what other companies do," Plaintiffs say that "Roberts offers no opinion on what industry standard infringement mechanisms are." Pls.' Opp'n 16. Roberts cannot assist the factfinder in understanding what other companies do if he has no knowledge or opinion about industry standard infringement mechanisms.

Apple also argued that Roberts is unqualified to opine about the iTunes Store because he knows nothing about Apple's systems, including what information it stores in its databases or what kind of contracts it has with its content providers. Apple Mot. 9. Plaintiffs' response is not that Roberts knows more about Apple or iTunes than was indicated in his report, or that his experience somehow qualifies him to opine about the iTunes Store. Instead, Plaintiffs argue that Roberts does not need to know anything about the iTunes Store because "Apple *admits* that it does nothing behind the scenes to prevent infringing content from being uploaded to" the iTunes Store. Pls.' Opp'n 14. That is simply false.

---

[3] If Plaintiffs are referring to Gracenote, they do not explain why the practices of a "metadata and media recognition provider" should inform an expert's views about what an entirely different type of company (such as a digital music retailer) should be doing to prevent copyright infringement.

Apple does not "admit" that it does nothing to prevent copyright infringement; to the contrary, it filed a motion for partial summary judgment on willfulness because no reasonable jury could find that its alleged infringement was willful, given the numerous copyright-*protective* measures Apple has put in place to prevent copyright infringement, including application requirements, contractual representations and warranties from its content providers, a robust notice-and-takedown system, and the ability to block certain content providers from uploading content to the iTunes Store. Dkt. 109 at 19–27. Plaintiffs cannot excuse their expert's lack of knowledge of Apple's systems by misrepresenting the positions Apple has taken in this litigation.

Plaintiffs conclude their opposition by asserting that Roberts's opinion is, "in sum and substance, that Apple designed a system willfully blind to infringement that ignored suspicious uploads of classic recordings by unknown providers," and that his "actual opinion is that Apple designed a system that was blind to infringement." Pls.' Opp'n 16, 18. Thus, Plaintiffs have admitted that Roberts's opinion is that Apple was "willfully blind" to infringement—a legal conclusion that invades the province of the fact-finder. *Nationwide Transp. Fin. v. Cass Info Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law" (quoting *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004))); *Sound View Innovations, LLC v. Hulu, LLC*, 2019 WL 4640393, at *6 (C.D. Cal. Aug. 5, 2019) (the question of "whether [a d]efendant had the requisite intent to establish willful infringement, [] is a 'classical question' for the jury." (quoting *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016))); *see also* Dkt. 131 at 9–11. This is yet another reason to exclude Roberts's opinions about what Apple purportedly could have done differently.

### III. CONCLUSION

The Court should strike Roberts's report from the summary judgment record and preclude Roberts from testifying at trial.

Dated: January 18, 2021

GIBSON, DUNN & CRUTCHER LLP

By: /s/ *Scott A. Edelman*
　　Scott A. Edelman

Attorneys for APPLE INC.